STATE OF NORTH CAROLINA v. DANNY MARK DEANES

No. 489A87

(Filed 8 December 1988)

1. **Criminal Law § 73.2— residual hearsay exception—prescribed inquiries by trial court**

    A trial court considering the admission of evidence under N.C.G.S. § 8C-1, Rule 803(24) (1988), the residual exception to the hearsay rule, must determine in this order: (A) Has proper notice been given? (B) Is the hearsay not specifically covered elsewhere? (C) Is the statement trustworthy? (D) Is the statement material? (E) Is the statement more probative on the issue than any other evidence which the proponent can procure through reasonable efforts? (F) Will the interests of justice be best served by admission? The trial court must make findings of fact and conclusions of law on the issues of trustworthiness and probativeness, and must make conclusions of law and give its analysis on the other issues.

2. **Criminal Law § 73.2— rape of child—statements child made to social worker—admissible**

    In a prosecution for the first degree rape of a five-year-old child in which the child did not testify, there were sufficient circumstantial guarantees of trustworthiness to admit the testimony of a social worker as to statements the child had made to her where the court's findings and conclusions demonstrate that the court properly considered factors bearing upon the child at the time the statement was made and other evidence which, in retrospect, tended to support the truthfulness of the child's statement. Moreover, there was no merit to the contention that the evidence failed to support the finding that the child consistently described the same basic events each time she was interviewed; any error in the finding that the child would have been unable to use the dolls to describe sexual intercourse without some experience was harmless, given the other persuasive findings supported by overwhelmingly competent evidence; and certain hearsay statements were not objected to and introduced, the rules of evidence are somewhat relaxed during a voir dire, and there was plenary other evidence to support the trial judge's findings of trustworthiness.

**3. Criminal Law § 73.2; Witnesses § 1.2— child rape victim—child not competent to testify—statements to social worker admitted**

The trial court did not abuse its discretion in a prosecution for the rape of a five-year-old child by finding the child incompetent and thus unavailable to testify where the judge conducted a competency hearing at which he was able to observe for himself the child's competence to be a witness, and the record shows that the child could not respond to simple questions about basic facts in her life and that she was contradictory, uncommunicative, and frightened.

**4. Constitutional Law § 70— child rape victim—ruled incompetent to testify—statements to others admitted—no violation of right to confrontation**

In a prosecution for the first degree rape of a five-year-old child in which the child did not testify but her statements to others were admitted, there was no merit to defendant's argument that his right to confrontation under the Sixth Amendment of the U. S. Constitution and article I, section 23 of the North Carolina Constitution was violated where the trial judge correctly concluded that the trustworthiness and probative prongs of the test set out in *State v. Smith*, 315 N.C. 76, were established and the evidence was properly admitted under the residual exception to the hearsay rule.

**5. Criminal Law § 73.2; Witnesses § 1.2— child rape victim—child incompetent to testify—out-of-court statements admitted—no per se rule**

Although the admission of a child rape victim's out-of-court statements was approved in a case in which the child did not testify at trial, there is no per se rule that a child victim's statement to a social worker is admissible when the child is not found to be competent as a witness and there is some corroboration of the child's statements. The confrontation clause and N.C.G.S. § 8C-1, Rule 803(24) require a case-by-case examination of the facts.

**6. Criminal Law § 73.1— child rape victim—doctor's testimony as to lab test results—hearsay—later admitted without objection**

There was no prejudice in a prosecution for the rape of a five-year-old child from the testimony of a doctor that the lab had called her office the day after she sent the child's specimen and informed her that the culture was positive for gonorrhea because testimony that the child had tested positive for gonorrhea was admitted without objection the next day through the testimony of the lab manager.

**7. Criminal Law § 73.2— child rape victim—laboratory test results—not hearsay**

The trial court did not err in a prosecution for the rape of a five-year-old child by admitting into evidence a laboratory worksheet prepared by Roche Labs confirming the presence of gonorrhea in the child where the manager of the lab section performing the test was a qualified witness; he identified the exhibit as a computer worksheet documenting the work performed on the specimen and testified that the work on the specimen was done and the results recorded promptly by a medical technologist in the regular course of business; and although the tests were performed and recorded after defendant had been arrested and charged with the child's rape, the requirement that the records be prepared *ante litem motam* is satisfied in that there is no evidence that

anyone at the lab had any knowledge of the criminal prosecution or any motive to distort the truth if they had known of it.

**8. Rape and Allied Offenses § 4.2— child rape victim—potential long term effect of untreated gonorrhea—irrelevant but not prejudicial**

There was no prejudice in a prosecution for the first degree rape of a five-year-old child from testimony concerning the potential long term effect of untreated gonorrhea in a small child in view of the overwhelming evidence against defendant. N.C.G.S. § 15A-1443(a) (1988).

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a mandatory sentence of life imprisonment entered by *Griffin, J.,* at the 15 July 1987 Criminal Session of Superior Court, HERTFORD County, upon defendant's conviction by a jury of first-degree rape. Heard in the Supreme Court 12 September 1988.

*Lacy H. Thornburg, Attorney General, by Catherine C. McLamb, Assistant Attorney General, and Elizabeth G. McCrodden, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Teresa A. McHugh, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant Danny Mark Deanes was convicted of the first-degree rape of a five-year-old girl and sentenced to life imprisonment. Having reviewed the four assignments of error defendant has presented, we find no error in his trial.

The State's evidence, in pertinent summary, showed the following: in early May of 1987, the defendant Danny Mark Deanes was living in the home of the victim's mother. Also living there were the five-year-old victim, her younger sister, her mother, and her mother's boyfriend. The house was small, with three rooms—a living room, a kitchen, and one bedroom. The bedroom contained two beds—a large bed and a small one. The victim's mother, her boyfriend, and the two little girls slept in the bedroom; the defendant slept on a couch in the living room.

The victim's mother testified that on Friday morning, 1 May 1987, she began drinking at home as she usually did. Her two little girls were at home with her. They went out about noon and returned home about 7:00 p.m. She fed, bathed, and dressed the

girls for bed. At about 8:00 p.m. she and her daughters went to sleep together in one bed in the bedroom. Having been drinking most of the day, she was intoxicated when she went to bed.

When the mother awoke about midnight, the victim was talking to her. The child complained that she was sore and sticky around her vagina. Her mother looked at her and saw that the area was "sore and sticky-like." She bathed the child and put some vaseline on the irritated area. The mother asked the child if anyone had been "messing with" her. The child said, "Yes." When the mother asked, "Who?" the child answered, "Danny."

The mother walked into the living room and saw her boyfriend asleep on the couch and defendant asleep in a chair. They had been to a party and had come in while she was asleep. She did nothing then because she was still under the influence of alcohol. The next morning she asked the defendant if he had "messed with" the child, and he denied it.

That Saturday morning the child began calling the defendant the "Monster Man." On Monday, 4 May, the Hertford County Department of Social Services (DSS) received an anonymous report that the victim had been raped. As a result of that call, Murfreesboro Chief of Police, Robert Harris, visited the victim's mother. She was drunk. He told her he had received a report that her daughter had been raped. At first, she said her child had not been raped; she had a rash, and the report was only a rumor. When the Chief said he would bring charges against her if he found she was lying, she said she was afraid to report it because she had no money to take the child to the doctor and no evidence of the rape except that the child had started to call the defendant "Monster Man."

Chief Harris called DSS social worker Susan Farmer to arrange for her to take the child to a physician for an examination. Later that day, Ms. Farmer and Chief Harris talked with the victim and her mother in the police car parked in front of their house. The child seemed ill at ease, so Chief Harris and the victim's mother got out of the car so the social worker and the child could talk privately.

Once alone with the child, Ms. Farmer tried to make her feel at ease. Ms. Farmer talked about how pretty she was, asked

about her brothers and sisters, and "got her to laughing and talking some." Then, once the child was relaxed, Ms. Farmer asked her if anyone had "messed with her" or "touched her in any way that they shouldn't." The child answered, "Yes, the Monster Man" had. Then the social worker asked specifically: "What did the Monster Man do?" The child answered: "Messed with me" and pointed down at the area around her vagina.

When Ms. Farmer asked where it had happened, the child pointed to her house and indicated it happened in the bedroom, but was not more specific. The child said her mama and her sister were asleep and there were other people in the house. Then the social worker asked "Who is the Monster Man?" and the child answered, "Danny." The five-year-old said she did not know his last name.

Ms. Farmer asked if anyone else who had come to her mother's house had ever touched her. The child said, "No." When asked *who* had visited her mother's house she gave the first names of her mother's boyfriend and a female friend of her mother. She also said there were other people who came over, but she didn't know their names. The child said her mother's boyfriend had never touched her. Ms. Farmer asked again, "Who has touched you in a way that did not feel right or any place that they shouldn't?" Again, the child answered, "The Monster Man." Then Ms. Farmer asked the child if she knew what a lie was. The child answered, it's "when you tell a story." Ms. Farmer asked, "does that mean when you are not telling the truth?" And the child answered, "Yes."

Then the social worker talked with the mother and made arrangements for the child, her mother, and sister to stay overnight with the maternal grandmother.

On Tuesday, 5 May, Ms. Farmer took the child and her mother to see Dr. Bonnie Revelle, a pediatrician in practice in Ahoskie. After the child had spent a few minutes alone with Dr. Revelle and had been hesitant in responding to her questions, Ms. Farmer was called in to talk with the child and to calm her during the examination. The doctor began the physical exam by checking the child's eyes and nose and ears and listening to her heart. Then the child was put on all fours in order to examine her vagina. There was a greenish-white discharge; the hymen was more re-

laxed and open than is normal for a five-year-old, and there were three areas around the vaginal opening which were chafed. When she was asked why she had been brought to see the doctor, she said it was because of her "rash." Then Ms. Farmer asked if someone had been "messing with" her, and she nodded "yes." Then Ms. Farmer asked her if she could "tell Dr. Revelle who" it was. The child told Dr. Revelle, "Danny."

Then the child and her mother went with Ms. Farmer to her office. There Ms. Farmer interviewed the child using anatomically correct dolls. Ms. Farmer testified that she began, as is always her procedure, by sitting on the floor with the child. She offered the child the female doll and let the child hold the doll. She asked the child if she liked the doll, and she said she did. Then, on her own, the child unsnapped the doll's dress and pulled it off, leaving the panties on. After the child had looked at the doll and played with it for a few minutes, Ms. Farmer began to talk about the male doll with the child. She asked if the child knew the doll was a boy; she said, "Yes." Then the child opened his shirt. She laughed when she saw the doll had hair on his chest and under his arms. Then Ms. Farmer asked if the child knew the difference between boys and girls; in answer, the child undid the doll's pants, pulled his pants down, and then put his pants back on. Then Ms. Farmer picked up the girl doll again and said, "Let's pretend this doll's name is the same as yours." The child liked that, and held the doll for a few minutes.

Then Ms. Farmer said: "I want you to take the male doll and . . . show me what happened to you." The child took the male doll, undid his pants and pulled them down, put him on top of the female and tried to insert the penis into the vagina of the female doll. Then Ms. Farmer asked, "Is this what happened to you?" The child said, "yes." When Ms. Farmer asked who the male doll was, the child said, "Danny."

Then Ms. Farmer took the child and her mother to Police Chief Harris' office. The child said her mother had been drinking on the day the incident occurred, and that she had gone to bed and to sleep. Then using the dolls, she again demonstrated what had happened to her, and related that she had awakened her mother and told her that Danny had messed with her.

Pediatrician Bonnie Revelle also described the child's physical exam on Tuesday, 5 May. After the child's initial reluctance to

volunteer information, Dr. Revelle asked her if anyone had touched her in her private area. The child nodded, "Yes." Dr. Revelle asked her, "Who messed with you?" She responded, "Danny." At that time, only the two of them were in the examining room. As part of the exam, Dr. Revelle had taken a sample of the vaginal discharge, plated it on a growth medium and sent it to Roche Biomedical Laboratories for identification of the organism. The next day a person from the lab called her to report that the culture was positive for gonorrhea.

Peter Huley, Manager of the Microbiology and Virology Section of Roche Biomedical Laboratories, testified. He identified the original computer worksheet, and a copy documenting the work performed on the child's specimen. The copy was introduced in evidence. Huley testified further that the test was done in the regular course of business using standard procedures and that the information was recorded promptly using standard procedures. He testified further that he had not known until he was called to testify that morning that there was any legal involvement with the case. He summarized the procedures used in the lab to confirm that the culture from the child's specimen tested positive for gonorrhea.

The State also introduced evidence that a sample of discharge taken from the penis of the defendant had tested positive for gonorrhea. A nursing supervisor from the Health Department testified that a person will show symptoms of gonorrhea within one to three days after sexual contact with an infected person.

When the child was called as a witness, the trial judge conducted a voir dire to determine if the child were competent as a witness. After the child, the social worker, the police chief, and the pediatrician were examined on voir dire, the court found the child to be "a shy and ineffective communicator," and not competent to testify. He concluded that the child was unavailable as a witness.

The defendant presents four assignments of error, which we will address in turn.

I

[1] In his first assignment of error, Deanes contends that the trial judge should not have permitted social worker Susan

Farmer to testify to the statements the child made to her on 4 and 5 May. He challenges her testimony under Rule 803(24) and under the confrontation clauses of the sixth amendment of the United States Constitution and article I, section 23 of the North Carolina Constitution.

The court admitted the statements as substantive evidence under North Carolina Rule of Evidence 803(24), the residual or "catchall" exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(24) (1988). To facilitate appellate review of the propriety of the admission of evidence under 803(24), this Court has prescribed a sequence of inquiries which the trial court must make before admitting or denying evidence under Rule 803(24). *State v. Smith*, 315 N.C. 76, 92, 337 S.E. 2d 833, 844 (1985). The trial court must determine in this order:

(A) Has proper notice been given?

(B) Is the hearsay not specifically covered elsewhere?

(C) Is the statement trustworthy?

(D) Is the statement material?

(E) Is the statement more probative on the issue than any other evidence which the proponent can procure through reasonable efforts?

(F) Will the interests of justice be best served by admission?

*Id.* at 92-97, 337 S.E. 2d at 844-47. The trial court is required to make both findings of fact and conclusions of law on the issues of trustworthiness and probativeness, because they embody the two-prong constitutional test for the admission of hearsay under the confrontation clause, i.e., necessity and trustworthiness. *Ohio v. Roberts*, 448 U.S. 56, 65 L.Ed. 2d 597 (1980); *State v. Smith*, 312 N.C. 361, 323 S.E. 2d 316 (1984). On the other four issues, the trial court must make conclusions of law and give its analysis. We will find reversible error only if the findings are not supported by competent evidence, or if the law was erroneously applied. *Milk Producers Co-op v. Dairy*, 255 N.C. 1, 120 S.E. 2d 548 (1961).

Defendant contends that the challenged evidence (1) was not sufficiently trustworthy, (2) was not more probative on the issue than any other evidence the State could have procured through

reasonable efforts, and (3) did not serve the interests of justice because admission of the statements deprived the defendant of his right to confrontation.

A. *Trustworthiness*

[2] Deanes first contends that the child's statements to the social worker did not possess sufficient "circumstantial guarantees of trustworthiness." He contends that the judge erred in considering evidence that did not bear on the trustworthiness of the child's statements at the time the statements were made and that the context in which the child's statements were made does not guarantee their trustworthiness. In addition, he argues that certain physical evidence relied upon by the judge to support his findings was incompetent.

First, we consider the rule's requirements for the element of trustworthiness. Rule 803(24) permits the admission of a statement "not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness." N.C.G.S. § 8C-1, Rule 803(24) (1988). The confrontation clause also imposes a requirement of trustworthiness. The statement of a hearsay declarant is admissible only if it bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L.Ed. 2d 597, 608.

In *State v. Smith* we recognized that certain factors are acknowledged by courts and commentators as "significant in guiding the trial judge's determination of the proffered statement's trustworthiness." 315 N.C. at 92, 337 S.E. 2d at 845. By way of illustration, we listed four of the factors consistently recognized as significant: (1) assurance of personal knowledge of the declarant of the underlying event, (2) the declarant's motivation to speak the truth or not speak the truth, (3) whether the declarant ever recanted the testimony, and (4) the practical availability of the declarant at trial for meaningful cross-examination. *Id.*

Like the rule's specific hearsay exceptions, the first two of these significant factors bear upon the declarant at the time the statement is made. Consequently, they have "circumstantial guarantees of trustworthiness" "equivalent" to the specific exceptions in Rule 803.

The third and fourth factors listed (whether the declarant ever recanted the statement and whether the declarant is available for meaningful cross-examination) do not bear upon the declarant at the time he is speaking but, viewed in retrospect, tend to support the truthfulness of his statement, and therefore, bear on the question of the truthfulness of the hearsay statement. *See* McCormick on Evidence § 324.2 (3d ed. 1984).

In his order, the trial judge made the following conclusions of law supporting the trustworthiness of the statements made by the child to Ms. Farmer:

> 3. That the child is motivated to speak truthfully about the events because of the injury she received which produced the physical evidence observed by Dr. Revelle on her body and the need for such injury to be treated;

> 4. That the nature and character of the statement[s] are consistent with the physical evidence observed by Dr. Revelle in that the child would be motivated to deal truthfully with a person in authority, such as Susan Farmer, and particularly the doctor who was treating the child's injury;

> 5. That the totality of the circumstances in this case assure a reasonable probability of truthfulness of the statements made by the declarant . . . to Miss [sic] Farmer and Dr. Revelle.

The trial judge concluded that, at the time the child made the statement to the social worker, she was motivated to tell the truth for at least two reasons: (1) "because of the injury she received . . . and the need for such injury to be treated," and (2) because a five-year-old child "would be motivated to deal truthfully with a person in authority such as Susan Farmer."

Deanes contends that the circumstances do not show the child was "motivated to tell the truth." He points out there was no evidence she would be punished if she lied, and the only evidence that she knew the difference between the truth and a lie was the social worker's statement as to what the victim said when the social worker asked if she knew what a lie is. Second, Deanes maintains there was no evidence that Ms. Farmer approached the child as an "authority figure," pointing to evidence

tending to show she established a friendly rapport with the child. Finally, he contends that because the child's statements were not volunteered and were repetitious of the words used by the social worker, her responses may have been influenced by her adult questioners. As support, Deanes points out the child repeated the phrase, "messed with," to describe her assault, the same phrase used by the social worker.

Deanes' contentions that the circumstances do not show the child was motivated to tell the truth are without merit. First, absent a history of fabrication in a child, there is no authority for the proposition that to be motivated to tell the truth a five-year-old must be subject to punishment.

Second, it is only common sense to recognize that an adult need not "approach" a child as an "authority figure" in order to *be* a "person in authority" to a child. By designating Ms. Farmer a "person in authority," the judge acknowledges she arrived with the sheriff, questioned the child, took her to the doctor, and was an adult to whom the child would be motivated to tell the truth because she had taken the time to put the child at ease, to express interest in her, and to draw her out—as the record shows this social worker had done.

Finally, there is no reason to question the truthfulness of a five-year-old simply because she did not initiate the conversations with Ms. Farmer and Dr. Revelle to report the incident, as Deanes suggests we should. Children may fail to initiate a report of sexual abuse for many reasons: they may lack the verbal capacity to report it or the knowledge that an incident is inappropriate or criminal. They may be embarrassed, or threatened into silence, and they may fear that when they do report it, their reports may be "dismissed as fantasy or outright lies." D. Whitcomb, E. Shapiro & L. Stellwagen, *When the Victim Is a Child: Issues for Judges and Prosecutors* at 4 (1985). In cases of child sexual abuse, it is often necessary to ask questions designed to help the child describe what happened.

There is evidence the social worker was aware of the danger of putting words in the child's mouth and that she took pains to guard against that danger. The social worker testified she did not suggest answers or responses to the child during any interview. Furthermore, defense counsel had the opportunity to question her

about the procedures she used to interview the child and so to expose to the jury any bias inherent in the procedure. He did not do so. Finally, we find no indication in the record that the social worker suggested answers to the child during any interview with her, or that the interviews using the anatomical dolls were not administered in a neutral way. The fact that the child used the same words that the social worker used to describe what Deanes did to her only shows that the social worker was attuned to the words that would carry meaning to the child. By pointing to her vaginal area when she first told Ms. Farmer, "He messed with me," the child signalled that she understood the phrase, "messed with."

The trial court also concluded that other factors, not bearing upon the child at the time the statement was made, supported the truthfulness of her statement to the social worker. He noted first that the content of the child's statements was "consistent with" the clinical evidence of abuse and infection observed by Dr. Revelle, and second, that the "totality of the circumstances" assured a reasonable probability of truthfulness. The "totality of the circumstances" included the following factual findings which are consistent with the child's statement: (1) the child's enactment of sexual intercourse through the use of the dolls, (2) her statement that the person who did this to her was "Monster Man" whom she identified as "Danny," (3) that the defendant Danny Deanes spent the night at the child's house on the night she first complained to her mother, (4) that the defendant had also been diagnosed and treated for gonorrhea, and (5) that the child had described the same basic events each time she had been interviewed, and had not recanted since initially describing them.

These findings and conclusions of law demonstrate that the trial court properly considered factors bearing upon the child at the time the statement was made and other evidence which, in retrospect, tended to support the truthfulness of the child's statement. Consequently, Deanes' argument that the judge erred as a matter of law in considering evidence that did not bear on the trustworthiness of the child's statement at the time it was made has no merit.

Deanes also contends that certain physical evidence relied upon to support the findings was incompetent.

First, he contends the evidence fails to support the finding that the child "consistently described the same basic events" each time she was interviewed. He emphasizes her sometimes contradictory answers and answers that conflicted with other evidence. This argument has no merit.

The child consistently reported the same basic events each time she was asked to talk about them. When she first woke her mother in the night she complained of soreness in the vaginal area, and in answer to her mother's question, "Who messed with you?" she said first "the Monster Man," and then "Danny." In each subsequent account, she complained of soreness in the vaginal area, said it was the "Monster Man" who did it, and/or identified the monster man as "Danny." The child gave the same account on at least five different occasions: to her mother, to Ms. Farmer in the police car, to Ms. Farmer in the police chief's office, to Dr. Revelle in Ms. Farmer's presence, and to Dr. Revelle alone. Also significant is the fact she never recanted her account.

The defendant also contends that this child's accounts of the events are not sufficient to constitute a "description" of the incident as the trial court found as a fact. We disagree. The social worker, testifying as an expert witness, testified that anatomically correct dolls are used by social workers at the Department of Social Services to interview younger children because, by using the dolls, the children can demonstrate what they want to communicate but find hard to put into words. If the child's verbal account was supplemented by her demonstration with the anatomically correct dolls, the child gave a complete account of the assault. In response to Ms. Farmer's question, "Show me what happened to you," the child attempted to demonstrate an act of vaginal intercourse using the male and female dolls by taking off the pants of the doll, putting him on top of the female, and by putting the penis into the vagina of the female doll. She repeated the demonstration in the police chief's office.

The defendant also argues the child's testimony was not trustworthy because the child gave conflicting testimony about the specific location in the house where the incident occurred. As the social worker testifying as an expert witness explained, five-year-old children are often vague or inconsistent about details of an act of abuse.

Defendant also contends that the child's statement that she was wearing a pajama top and panties when she woke her mother complaining is somehow inconsistent with her testimony that "the Monster Man messed with me." The defendant has demonstrated no irreconcilable inconsistency, and we find none.

Second, the defendant contends that the evidence fails to support the judge's finding that "at this child's age, she would have been unable to use the dolls to describe sexual intercourse without some experience." Deanes points out that since the child slept in the same room with her mother and her mother's boyfriend, the sleeping arrangement provided opportunities for the child to be "exposed to" sexual intercourse. This is probably true. However, if this was error, it was harmless, given the other persuasive findings supported by overwhelmingly competent evidence.

Third, Deanes argues that during voir dire the trial judge admitted into evidence three hearsay statements that did not fall under any exception to the hearsay rule. He contends the trial judge improperly relied upon this allegedly incompetent evidence in making his findings of fact and conclusions of law. For this reason, he says the trial judge's conclusions were invalid and should be overturned. Specifically, he objects to three statements by Ms. Farmer: her statement that she had received the first report of the child's rape through an anonymous telephone call to the Department of Social Services, that Deanes' test had come back positive for gonorrhea, and that Deanes had been treated for gonorrhea.

Deanes' complaint has no merit. Defendant made no objection to the first two statements when they were introduced. As to the third, as acknowledged by the defendant, rules of evidence are somewhat relaxed during a voir dire. The judge is presumed to have considered only the competent evidence in determining the ultimate issue. *See State v. Willard*, 292 N.C. 567, 234 S.E. 2d 587 (1977). Furthermore, even if these three statements were incompetent, there was plenary other evidence in the record to support the trial judge's finding of trustworthiness.

### B. *Probativeness*

[3] Deanes contends that Ms. Farmer's statements were not more probative than other evidence that the State could procure

because the trial judge erred in ruling that the child was an incompetent witness and therefore unavailable to give testimony.

A hearsay statement is admissible under Rule 803(24) only if it "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." N.C.G.S. § 8C-1, Rule 803(24) (1988). The confrontation clause also imposes a requirement of necessity, e.g., that the declarant be unavailable at trial. *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L.Ed. 2d 597, 607; *State v. Smith*, 312 N.C. 361, 323 S.E. 2d 316. As Deanes correctly points out, if the declarant is available at trial, the degree of necessity to admit his or her hearsay statement is greatly diminished. "Usually, *but not always*, the live testimony of the declarant will be the more (if not the most) probative evidence on the point for which it is offered." *State v. Smith*, 315 N.C. at 95, 337 S.E. 2d at 846. Consequently, defendant contends, if the child had been available to testify, her testimony would have been more probative on the issue of Deanes' rape of her than her statement to the social worker would have been.

In *State v. Fearing*, 315 N.C. 167, 337 S.E. 2d 551 (1985), this Court considered what is required for a finding of "unavailability" when the declarant does not testify. In *Fearing*, the parties *stipulated* that a child victim of sexual abuse was not competent to testify. The trial judge did not personally examine the child to determine her competence. The trial court adopted the parties' stipulations as fact, concluded the child was "unavailable," and admitted the evidence of the child's out-of-court statements implicating the defendant. On our own review of the record, we found the procedure flawed, affecting substantial rights of the defendant by the admission of highly prejudicial testimony, and ordered a new trial. *Id.* at 174, 337 S.E. 2d at 555. We noted that underlying our law governing competency is the assumption that a trial judge must rely on his personal observation of the child's demeanor and responses to inquiry at the competency hearing. *See* N.C.G.S. § 8C-1, Rule 104(a) commentary (1988), and 1 Brandis on North Carolina Evidence § 8 (1982); N.C.G.S. § 8C-1, Rule 601 commentary (1988), and 1 Brandis on North Carolina Evidence § 55 (1982). There can be no informed exercise of discretion where the trial judge fails to personally examine or observe the child on voir dire. *See, e.g., State v. Roberts*, 18 N.C. App. 388, 391, 197 S.E. 2d 54, 57, *cert. denied*, 283 N.C. 758, 198 S.E. 2d 728

(1973). We held that the trial judge is not free to base his conclusion that the child is "unavailable" on facts stipulated by the parties.

In *State v. Gregory*, 78 N.C. App. 565, 338 S.E. 2d 110 (1985), *disc. rev. denied*, 316 N.C. 382, 342 S.E. 2d 901 (1986), our Court of Appeals specifically addressed the defendant's confrontation rights under these circumstances. In *Gregory*, the trial judge conducted the required competency hearing and found the child victim failed to meet the competency requirements set forth in N.C.G.S. § 8C-1, Rule 601(b). Under the medical treatment exception, Rule 803(4), the trial court admitted the child's statements to her physician and to her grandmother identifying the defendant as her attacker. On defendant's petition for discretionary review, this Court denied the petition and granted the State's motion to dismiss the petition for want of a substantial constitutional question. As Chief Judge Hedrick wrote for the panel, "The unavailability of the victim due to incompetency and the evidentiary importance of the victim's statements adequately demonstrate the necessity prong of the two prong confrontation clause test." *Gregory*, 78 N.C. App. at 568, 338 S.E. 2d at 112-13.

Under similar circumstances, the Court of Appeals also found no error in the admission under the medical treatment exception of a child victim's out-of-court statements to her mother and to a social worker implicating the defendant when the court found the child incompetent to testify. *State v. Jones*, 89 N.C. App. 584, 367 S.E. 2d 139 (1988).

In the case before us, the requirement of probativeness is clearly met. Before ruling that the child was not competent to testify and therefore unavailable, Judge Griffin conducted a competency hearing. He was able to observe for himself the child's competence to be a witness. During the child's questioning by the prosecutor, the record shows that she could not respond to simple questions about basic facts in her life, and that she was contradictory, uncommunicative, and frightened. Absent a showing that the rulings as to competency could not have been the result of a reasoned decision, there is no abuse of discretion and the ruling must stand on appeal. *State v. Hicks*, 319 N.C. 84, 352 S.E. 2d 424 (1987). The record clearly shows the trial judge's decision was reasoned and that he did not abuse his discretion in finding this

witness incompetent to testify, and thus unavailable. *State v. Gordon*, 316 N.C. 497, 342 S.E. 2d 509 (1986); *State v. Fearing*, 315 N.C. 167, 337 S.E. 2d 551 (1985); *State v. McNeely*, 314 N.C. 451, 333 S.E. 2d 738 (1985); *State v. Jones*, 89 N.C. App. 584, 367 S.E. 2d 139 (1988); *State v. Gregory*, 78 N.C. App. 565, 338 S.E. 2d 110 (1985); N.C.G.S. § 8C-1, Rule 601 (1988).

C. *Interests of Justice*

[4]  Finally, Deanes contends that admission of Ms. Farmer's testimony violated his constitutional right to confront his central accuser, and therefore did not serve the interests of justice. He alleges violation of both the sixth amendment guarantee of the United States Constitution and the similar guarantee provided in article I, section 23 of the North Carolina Constitution.

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. *See Pointer v. Texas*, 380 U.S. 400, 403-05, 13 L.Ed. 2d 923, 926-28 (1965) (making sixth amendment applicable to the states through the fourteenth amendment).

The right of confrontation provided in article I, section 23 of the North Carolina Constitution "must be afforded an accused not only in form but in substance." *State v. Watson*, 281 N.C. 221, 230, 188 S.E. 2d 289, 294, *cert. denied*, 409 U.S. 1043, 34 L.Ed. 2d 493 (1972).

This important guarantee reflects the conviction that a face-to-face confrontation at trial with the witness enhances the truth-seeking process. The witness under oath is impressed with the seriousness of the matter and is subject to a penalty for perjury if he lies. Jury members observe the demeanor of the witness as he gives his statement and responds to cross-examination by the defendant. *California v. Green*, 399 U.S. 149, 26 L.Ed. 2d 489 (1970). By comparing what they have seen and heard on the witness stand against what they know of human nature, jury members decide if the testimony is worthy of belief. *Mattox v. United States*, 156 U.S. 237, 242-43, 39 L.Ed. 409, 411 (1895).

The general rule against the admissibility of hearsay evidence reflects the same conviction: that face-to-face confrontation

enhances the truth-seeking process. *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L.Ed. 2d 597, 608 (citing *California v. Green*, 399 U.S. 149, 155, 26 L.Ed. 2d 489, 495).

Deanes properly acknowledges that the right to confrontation is not absolute. *Ohio v. Roberts*, 448 U.S. 56, 65 L.Ed. 2d 597; *State v. Smith*, 312 N.C. 361, 323 S.E. 2d 316. There are other paths to the truth. Indeed, "[a] technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant." *Mattox v. United States*, 156 U.S. 237, 243, 39 L.Ed. 409, 411.

Consequently, the courts have never construed the confrontation clause to preclude the introduction of all hearsay statements. *Ohio v. Roberts*, 448 U.S. 56, 63, 65 L.Ed. 2d 597, 606. In *Roberts*, the Supreme Court enunciated a two-part test for determining when the right to confrontation must yield to the admissibility of hearsay statements. The proponent (1) must show the necessity for using the hearsay declaration, i.e., the unavailability of the witness, and (2) must demonstrate the inherent trustworthiness of the declaration. *Roberts*, 448 U.S. at 65, 65 L.Ed. 2d at 607; *Smith*, 312 N.C. 361, 323 S.E. 2d 316. *See* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations*, 98 Harv. L. Rev. 4, 806-27 (1985). As we stated in the introduction to this discussion, the *Roberts* test is incorporated in the trustworthiness and probativeness prongs of the test set out in *State v. Smith*, 315 N.C. at 92-97, 337 S.E. 2d at 844-47. Accordingly, since we have found that Judge Griffin correctly concluded that those elements were established and the evidence properly admitted under the residual exception to the hearsay rule, we find no merit in defendant's argument that his confrontation rights were violated.

[5] Upon our own independent review of the record, we are convinced that the findings were supported by competent evidence, that the findings support the conclusions, and that the law was properly applied. This is the first case in which we approve the admission of a child victim's out-of-court statements in evidence against the defendant in a sexual abuse case in which the child did not testify at trial. We emphasize that in approving the admission of the child's statement, we do not establish a per se rule

that a child victim's statement to a social worker is admissible when the child is found not to be competent as a witness and there is some corroboration of the child's statements. The confrontation clause and Rule 803(24) require a case-by-case examination of the facts of each case to ensure that their elements are fully satisfied.

## II

[6] In his second assignment of error, Deanes contends that the court should not have allowed Dr. Revelle to testify to the lab test results from the child's vaginal specimen because her statement was inadmissible hearsay. Dr. Revelle testified that the lab (Roche Biomedical Laboratories) called her office the day after she sent the child's specimen and informed her that the culture was positive for gonorrhea. Deanes contends he was prejudiced by the admission of this evidence because the existence of gonorrhea in both the child and the defendant provided crucial physical evidence linking the defendant to evidence of sexual assault upon the child.

We find this argument without merit. Testimony that the child had tested positive for gonorrhea was admitted without objection the next day through the testimony of Peter Huley, the manager of the lab performing the test. Any error was cured by the later introduction of this testimony without objection.

## III

[7] In his third assignment of error, Deanes objects to the introduction into evidence of State's Exhibit No. 3A, the laboratory worksheet prepared by Roche Labs confirming the presence of gonorrhea in the child. Deanes argues this is inadmissible hearsay, not within the business records exception, because the records were not prepared *ante litem motam*. His argument is without merit.

In *Sims v. Insurance Co.*, this Court applied the business records exception to hospital records and outlined the requirements for their introduction:

> In instances where hospital records are legally admissible in evidence, proper foundation must, of course, be laid for their introduction. The hospital librarian or custodian of

the record or other qualified witness must testify to the identity and authenticity of the record and the mode of its preparation, and show that the entries were made at or near to the time of the act, condition or event recorded, that they were made by persons having knowledge of the data set forth, and that they were made *ante litem motam.*

*Sims,* 257 N.C. 32, 35, 125 S.E. 2d 326, 329 (1962). Furthermore, in *State v. Wood,* 306 N.C. 510, 516, 294 S.E. 2d 310, 313 (1982), this Court indicated that the requirement that the records be prepared *ante litem motam* is an important element of the business records exception.

Black's Law Dictionary (5th ed. 1979) first defines *ante litem motam* in this way: "At [a] time when declarant had no motive to distort [the] truth." The definition then narrows: "Before suit brought, before controversy instituted. Also before the controversy arose."

After considering the foundational requirements and the definition of *ante litem motam,* it is clear the testimony was within the business records exception. As manager of the Roche Labs section performing the tests, Peter Huley was a "qualified witness." He identified State's Exhibit 3A as a computer worksheet documenting the work performed on the specimen. He also testified that the work on the specimen was done and the results recorded promptly by a medical technologist in the regular course of business after the sample was received by the lab on 6 May. Although it is true the lab tests were performed and recorded after Deanes had been arrested and charged with the child's rape, there is absolutely no evidence that anyone at the lab had any knowledge of the criminal prosecution, or any motive to distort the truth if they had known of it. Huley himself testified that he knew nothing of Deanes' prosecution until 9:12 a.m. on the morning he was called to testify. Likewise there was no evidence that the medical technologist who made the tests knew of the charges against Deanes or had any motive to distort the truth.

IV

[8]　Finally, Deanes objects to the admission of Dr. Revelle's testimony about the potential long-term effect of untreated gonorrhea in a small child. He maintains the testimony was irrelevant and highly prejudicial.

The prosecutor asked Dr. Revelle, "What happens . . . if a small child has gonorrhea and is not treated?" Dr. Revelle replied:

Gonorrhea is an infection of the mucous membrane of the body surface. The bacteria reproduces in warm, moist places, and so the most common place that it occurs is in the female vagina or cervix or uterus and in the male penis. Untreated it can spread within the body in those areas and it is quite common for women with untreated gonorrhea, after years of untreated gonorrhea, to have problems with infertility later.

The State concedes the limited relevance of this testimony, but contends the record, taken as a whole, supports the conclusion that these three sentences could not have affected the results of defendant's trial, and therefore, do not constitute prejudicial error. We agree. In view of the overwhelming evidence against the defendant, there is no reasonable possibility that had this evidence not been admitted the result would have been different. N.C.G.S. § 15A-1443(a) (1988).