STATE OF NORTH CAROLINA v. NEIL MATTHEW SARGEANT, Defendant

No. COA09-262

(Filed 3 August 2010)

## 1. Homicide— first-degree murder—verdicts—separate theories

The trial court erred in a first-degree murder prosecution by having the jury deliver its verdicts on lying in wait and felony murder at the end of one day, and then to continue deliberating and deliver its verdict on premeditation and deliberation the next day. The court may not take partial verdicts as to theories of a crime. Moreover, this intrusion into the province of the jury cannot be deemed harmless beyond a reasonable doubt; the jury's ultimate decision had it been permitted to continue deliberating on all of the theories of first-degree murder cannot be known.

## 2. Evidence— hearsay—residual exception—witness asserting Fifth Amendment—prior statement—equivalent guarantees of trustworthiness

The trial court erred in a prosecution for first-degree murder and other offenses by not allowing defendant to introduce a witness's statement to an officer where three people had participated in the murder; this witness (Dalrymple) agreed to testify against the third (Triplett) and gave a statement putting most of the blame on Triplett; Dalrymple was called to testify against defendant but asserted the Fifth Amendment; and defendant moved to admit the statement under the residual hearsay exception of N.C.G.S. § 8C-1, Rule 803(5). The trial court erred in its

1

STATE v. SARGEANT

[206 N.C. App. 1 (2010)]

findings concerning the required equivalent circumstantial guarantees of trustworthiness, and the error was prejudicial because the statement presented a very different picture of the crime.

Judge ERVIN dissenting.

Appeal by defendant from judgments entered 24 April 2008 by Judge Ronald K. Payne in Watauga County Superior Court. Heard in the Court of Appeals 2 September 2009.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Benjamin Dowling Sendor, for defendant-appellant.*

GEER, Judge.

Defendant Neil Matthew Sargeant appeals his convictions for first degree murder, first degree kidnapping, robbery with a dangerous weapon, and burning of personal property. The primary issue on appeal is whether the trial court erred in taking partial "verdicts" from the jury.

At trial, at the end of the first day of deliberation, the jury had not reached a unanimous decision as to each of the charges. The trial court requested that the jury go ahead and submit verdict sheets for any of the charges as to which it had unanimously found defendant guilty. The trial court then received the jury's verdicts finding defendant guilty of first degree kidnapping, robbery with a dangerous weapon, and burning of personal property, as well as first degree murder on the bases of both felony murder and lying in wait. The only issue left for the jury to decide was whether defendant was guilty of first degree murder on the basis of premeditation and deliberation. The next morning, the court gave the jury a new verdict sheet solely asking the jury to decide whether defendant was guilty of first degree murder on the basis of premeditation and deliberation. The jury returned a guilty verdict later that day.

The issue on appeal is whether it was error to take a "verdict" as to lying in wait and felony murder when the jury had not yet agreed on premeditation and deliberation. Premeditation and deliberation, felony murder, and lying in wait are not crimes, but rather are theories upon which a defendant may be convicted of first degree murder. We hold that a trial court cannot take a verdict on a theory. Therefore,

the trial court, in this case, erred by taking partial verdicts on theories as to the charge of first degree murder.

## Facts

Stephen Harrington was kidnapped, robbed, and murdered on the night of 7 November 2005. A medical examiner determined the cause of death to be asphyxiation. Defendant, Kyle Triplett, and Matthew Dalrymple were subsequently charged capitally with the first degree murder of Harrington. They were also charged with first degree kidnapping, robbery with a dangerous weapon, and burning of personal property. The three men and the victim were acquaintances who dealt and used illegal drugs together.

The State first proceeded against Triplett. On 10 September 2007, Dalrymple had given the State a written statement pointing to Triplett as responsible for the death of Harrington and as having orchestrated the removal of Harrington from defendant's home. In anticipation of trying Triplett, the State entered into an agreement with Dalrymple on 13 September 2007. In that agreement, the State agreed not to seek the death penalty against Dalrymple. In return, Dalrymple agreed to "be available to provide truthful testimony concerning the events surrounding the death of Stephen Harrington if called upon by the state to do so." The truthfulness of his testimony was to "be measured against [his] written statement in the presence of Detective Dee Dee Rominger on 10th September 2007." The State agreed further "[t]hat as to the statement to Detective Rominger the State will not use the statement against [Dalrymple] in any state criminal proceedings, and will not use any evidence derived from such statement against him in any state judicial proceeding."

Ultimately, Dalrymple was not required to testify against Triplett because Triplett pled guilty to second degree murder, among other offenses, for his involvement in the crime. The State next proceeded against defendant and called Triplett as a witness during the trial. Triplett's testimony placed the majority of the blame for Harrington's murder on defendant.

Triplett testified that when he arrived at defendant's house on the night of 7 November 2005, defendant told him to put on gloves, grab Harrington when he arrived later, and put a gun to Harrington's head. When Harrington arrived, Triplett grabbed Harrington by the throat and put a gun to his head. Then, defendant wrapped Harrington in duct tape and punched him while Dalrymple kicked him. Dalrymple

removed cocaine from Harrington's pocket before Triplett and defendant put Harrington in the trunk of Harrington's car. Triplett testified that he and defendant drove Harrington's car, while Dalrymple followed in a second car. They parked the car near a bridge where defendant sprayed Harrington's body with lighter fluid, and Triplett lit the fluid with a lighter. The three men then returned to defendant's house in the car driven by Dalrymple.

During defendant's case in chief, defendant called Dalrymple to the stand. Dalrymple invoked his Fifth Amendment right against self-incrimination and refused to testify. Since Dalrymple was unavailable to testify on defendant's behalf, defendant moved, pursuant to N.C.R. Evid. 804(b)(5), to introduce Dalrymple's 10 September 2007 statement to Detective Rominger. According to Dalrymple's statement, Triplett had grabbed Harrington by the neck and held him at gunpoint, as Triplett had testified, but Triplett was also responsible for duct-taping Harrington's head, hitting Harrington, and kicking him. Dalrymple stated that defendant had been asleep during the initial attack, but had awoken later and ridden in the second car with Dalrymple because Dalrymple was scared. Triplett, he said, lit the fire. The trial court concluded that the statement lacked sufficient indicia of trustworthiness and excluded the statement.

On the morning of Tuesday, 22 April 2008, with closing arguments having concluded the previous day, the court instructed the jury as to the charges, including the "three theories under which [the jury could] find [defendant] guilty of first degree murder, those theories being lying in wait, the felony murder rule, and premeditation and deliberation." The verdict sheet for the first degree murder charge set out the following choices:

WE THE JURY, AS OUR UNANIMOUS VERDICT, FIND THAT THE DEFENDANT, NEIL MATTHEW SARGENT, IS:

\_\_\_\_ GUILTY OF FIRST DEGREE MURDER.

\_\_\_\_ (A) IF YES, DO YOU UNANIMOUSLY FIND ON THE BASIS OF LYING IN WAIT.

\_\_\_\_ (B) IF YES, DO YOU UNANIMOUSLY FIND ON THE BASIS OF THE FELONY MURDER RULE

(I) \_\_\_\_ IF YES, DO YOU UNANIMOUSLY FIND THE UNDERLYING FELONY TO BE:

\_\_\_\_ 1. KIDNAPPING

_____ 2. ROBBERY WITH A DANGEROUS WEAPON

_____ (C) IF YES, DO YOU UNANIMOUSLY FIND ON THE BASIS [SIC] PREMEDITATION AND DELIBERATION

OR

_____ GUILTY OF SECOND DEGREE MURDER OR

_____ NOT GUILTY

The verdict sheets for the other charges gave the jury a choice of only guilty of the charge or not guilty, except for robbery, which had a choice of (1) guilty of robbery with a dangerous weapon, (2) guilty of common law robbery, or (3) not guilty.

At 10:55 a.m., after the jury had retired to deliberate, the jury sent its first note to the court: "What did State need to prove for a verdict of guilty to Burning of personal property—Can we have a list?" At 11:35 a.m., the jury sent another note: "Are there any possible consequences/punishments/repercussions to a witness for lying under oath? Specifically a witness who made a plea agreement with the State? We need to be reinstructed on the elements needed to be proven by the state on the charge of robbery w/ a dangerous weapon & common law robbery." The jury sent its third note at 12:25 p.m.: "Please reinstruct us on First Degree Murder. If we are going to lunch please wait until we return." Shortly after receiving this note, the court dismissed the jurors for their lunch break and told them to return at 2:00 p.m.

After the lunch break, the court reinstructed the jury on first degree murder. At 3:00 p.m., after having resumed deliberation, the jury sent a fourth note: "Would you reinstruct us on one theory @ a time so that we may deliberate one @ a time. Please redefine 'in concert[.]' Please redefine 'premeditated[.]' Please reinstruct on the difference between 1st & 2nd degree murder." In response to this note, the court first reinstructed the jury as to the theory of lying in wait. When the jury notified the court at 3:20 p.m. that it was ready for the next instruction, the court reinstructed the jury as to the theory of felony murder. After the jury indicated at 3:40 p.m. that it was ready for the final theory, the court reinstructed the jury as to the theory of premeditation and deliberation. At 4:15 p.m., the jury sent its fifth note of the day asking the court to "redefine two of five points" regarding premeditation and deliberation: "premeditation" and "intent."

**STATE v. SARGEANT**

[206 N.C. App. 1 (2010)]

Shortly after the jurors exited the courtroom, the trial judge informed the State and defendant that before the court recessed for the day, the trial judge intended to ascertain whether the jury had already reached any unanimous verdicts:

> Now, I am thinking about this. If we don't have the verdict, I should say verdicts by 5:00 p.m. I am going to make an inquiry if they've reached a verdict on any of the counts. If they have, it is my plan to take the verdict before we—those verdicts or verdict as the case may be if we have any before we adjourn for the evening. The reason being if they've reached a verdict on one or more and not on all and something happens over the evening hour I've got a problem. If we take those verdicts tonight, I won't have that problem.

Although the State had no objection, defendant noted his objection.

At 4:51 p.m., after about five hours of deliberation, the trial judge advised the State and defendant that he had resolved to go forward with his plan to assess the jury's progress:

> I think what I'm going to do is bring the alternates back as well as the other jurors. I'm going to make an inquiry and make it clear I'm not trying to rush them just to find out whether they've reached a unanimous verdict on all the matters. If they indicate they have not, I'm going to ask whether or not they've reached a unanimous verdict on any of the matters. If they have I'm going to make an inquiry of the foreperson to determine whether he has filled out the verdict sheets in accordance with my instructions on the matters which they have reached a unanimous verdict. If they have not, I'll send them back to the jury room with instructions to go ahead if they have reached a unanimous verdict to return so I can take this verdict before we adjourn for the evening. If they ask to continue and again this is not something I'm going to suggest but if they ask I'll send them back to the jury room and let them deliberate for a while. Now, I'm not going to keep them here late because they're going to want to be getting into the dinner hour . . . and most folks may well have other plans for the evening. But go ahead if we can, let's get the alternate jurors brought in first and if you will, Sheriff, get the jury, twelve jurors and tell them to stop deliberations and to bring the verdict sheets with them.

The jurors were then summoned back to the courtroom, and the trial judge addressed the foreperson, Mr. Price:

STATE v. SARGEANT

[206 N.C. App. 1 (2010)]

THE COURT: Mr. Price, I'm not asking you this in an effort to try to cause anyone to rush. That's the last thing I would want anyone to do but it is getting close to the evening break. Let me first begin by asking you, sir, has the jury reached a unanimous verdict in all matters?

FOREPERSON PRICE: No, sir.

. . . .

THE COURT: Has the jury reached a—and I take it's necessary for further deliberations on the matters that are not resolved, is that right?

FOREPERSON PRICE: Yes, sir.

THE COURT: Okay. Has the jury reached a unanimous verdict on any of the matters?

FOREPERSON PRICE: Yes, sir.

THE COURT: Okay. As to those matters have you filled out the verdict sheets in accordance with my instructions?

FOREPERSON PRICE: Yes, sir.

THE COURT: Is the jury ready to pronounce its verdict on those matters?

FOREPERSON PRICE: Yes, sir.

THE COURT: All right, I'm going to ask you to hand the verdict sheets to the bailiff.

The jurors then submitted the verdict sheets to the court, but since one of the verdict sheets was not yet signed, the trial judge sent the jury back to the jury room to properly complete the sheet.

Once the jury verified that all verdict sheets had been signed and dated, it was escorted back to the courtroom. At this point, the court received "the four verdicts" already decided upon: guilty of first degree murder on both the theories of lying in wait and felony murder, guilty of first degree kidnapping, guilty of burning of personal property, and guilty of robbery with a dangerous weapon. The jury had not reached a unanimous agreement about the first degree murder theory of premeditation and deliberation. The court then adjourned for the day.

Court reconvened at 9:30 a.m. the next morning, Wednesday, 23 April 2008. Before the jury entered, the trial judge explained that the

recording system had not been activated on the previous afternoon and informed the State and defendant that he would be retaking the verdicts so that they would have a proper record. The trial judge then gave both sides an opportunity to be heard. Defense counsel stated: "I'd move that the taking of the verdicts yesterday be set aside and the jury be sent out until they've reached a unanimous verdict on all issues. I believe that taking of partial verdicts violates [defendant's] right to a trial by jury."

When the jury entered the courtroom, the trial judge again explained the issue of the tape recording system and told the jury that he would retake the verdicts and poll each of the jurors. Each juror confirmed that he or she still assented to the guilty verdicts. Defense counsel renewed his motion to set aside the verdicts.

The trial judge returned the jury to the jury room to continue deliberating as to whether defendant was guilty of first degree murder on the theory of premeditation and deliberation. The trial judge had prepared a new verdict sheet solely for that issue. The new verdict sheet gave only two options: guilty or not guilty of first degree murder on the theory of premeditation and deliberation.

At 10:23 a.m., the jury sent the following note: "Please reinstruct on Malice, Premeditation & Deliberation. Please redefine 'premeditation.' " At 10:30 a.m., the jury sent its final note: "If we are not coming to a unanimous decision what do we do? Do we need to be unanimous for NOT GUILTY as well as for Guilty?" After receipt of the last note, the State indicated that it would have no objection to the trial court's declaring a mistrial as to the first degree murder theory of premeditation and deliberation. Defendant then formally moved for a mistrial on that theory, but the trial judge denied the motion. The judge subsequently informed the jury that a "verdict is not a verdict whether it's guilty or not guilty until all twelve jurors agree unanimously as to the decision." The judge also gave the jurors an *Allen* charge and sent them back to continue deliberating.

At 12:14 p.m. the jury returned a verdict of guilty of first degree murder based on the theory of premeditation and deliberation. The court polled each of the jurors and accepted the verdict.

Sentencing occurred on the morning of Thursday, 24 April 2008. Although defendant had been tried capitally, the State elected not to proceed with the death penalty phase. For the first degree murder conviction, defendant was, therefore, sentenced to life imprisonment

without parole. For the first degree kidnapping conviction, defendant was sentenced to a consecutive presumptive-range term of 100 to 129 months imprisonment. The trial court consolidated the robbery with a dangerous weapon and burning of personal property convictions and imposed a presumptive-range term of 60 to 81 months imprisonment to run consecutive to the kidnapping sentence. Defendant timely appealed to this Court.

I

**[1]** Defendant contends on appeal that the trial court erred in taking verdicts on two of the three possible theories of first degree murder on Tuesday and then, on Wednesday, permitting the jury to continue deliberating as to the third theory of first degree murder. Defendant argues that the trial court's procedure violated his "constitutional guarantee to a unanimous verdict of a jury of 12 in a criminal case." We note that the State has cited no authority authorizing what the trial court did in this case, and we have found none in North Carolina or in any other jurisdiction.

Premeditation and deliberation, felony murder, and lying in wait are all theories under which a defendant may be convicted of first degree murder. *See State v. Thomas*, 325 N.C. 583, 593, 386 S.E.2d 555, 560-61 (1989) ("Premeditation and deliberation is a theory by which one may be convicted of first degree murder; felony murder is another such theory."). Even though the State may proceed under multiple theories of first degree murder, "[c]riminal defendants are not convicted or acquitted of *theories* . . . ." *Id.*, 386 S.E.2d at 561 (emphasis added). Rather, "they are convicted or acquitted of crimes." *Id.* Thus, in cases involving multiple theories of first degree murder, the defendant is "charged with only one crime, first degree murder; [he or] she [is] convicted of that crime." *Id.*, 386 S.E.2d at 560.

A trial court includes the different theories on the first degree murder verdict sheet because of the need in sentencing—particularly capital sentencing proceedings—to understand the theory upon which the jury found the defendant guilty of first degree murder. *See State v. Goodman*, 298 N.C. 1, 16, 257 S.E.2d 569, 580 (1979) ("If the jury's verdict were general, not specifying the theory upon which guilt was found, the court would have no way of knowing what theory the jury used and would not have proper basis for passing judgment.").

Whether or not the jury based its verdict on premeditation and deliberation as well as felony murder determines what aggravating

circumstances may be submitted to the jury in capital sentencing. *See State v. Millsaps*, 356 N.C. 556, 560, 572 S.E.2d 767, 770-71 (2002) (holding that when defendant is convicted of felony murder only, underlying felony constitutes element of first degree murder and merges into murder conviction; if defendant is convicted of first degree murder based on both premeditation and felony murder, then felony underlying felony murder may be used as aggravating factor in sentencing proceeding, and defendant may receive separate sentences for both murder and felony). Further, the fact that a jury based its verdict only on felony murder may affect the findings necessary during capital sentencing. *See State v. Stokes*, 308 N.C. 634, 651 n.1, 304 S.E.2d 184, 195 n.1 (1983) (noting that, when felony murder is one theory presented, requiring jury to indicate theory under which jury returned first degree murder verdict may obviate need to have jury decide in sentencing whether defendant killed, attempted to kill, or intended that life would be taken).

Even in non-capital cases, specification of the theory affects whether the trial court should sentence the defendant for both the murder and any felony argued to be the basis for felony murder. *State v. Norwood*, 303 N.C. 473, 480, 279 S.E.2d 550, 555 (1981) ("Since conviction of the defendant for first degree murder was based upon proof of premeditation and deliberation, proof of the underlying felony was not an essential element of the State's homicide case and the trial court properly sentenced defendant both upon the murder conviction and the felony conviction."). Thus, a jury's specification of its theory does not constitute a conviction of a crime, but is for purposes of sentencing proceedings.

The State's argument that the jury in effect rendered three first degree murder verdicts—as opposed to verdicts on three theories—cannot be reconciled with *Thomas*, 325 N.C. at 593, 386 S.E.2d at 560 (rejecting dissent's argument because it "presupposes that defendant has been charged with, and could have been convicted of, two different crimes—first degree felony murder and first degree premeditated and deliberated murder"). In this case, there was only one conviction and one verdict finding defendant guilty of first degree murder, although the jury ultimately based its verdict on three theories. Only one person was killed, defendant was charged with only one count of first degree murder, the jury rendered a single verdict of guilty of first degree murder, and defendant was sentenced for only a single count of murder.

**STATE v. SARGEANT**

[206 N.C. App. 1 (2010)]

Consequently, we are not talking about true partial verdicts in this case: these were not verdicts as to crimes but factual findings regarding theories of the crime of first degree murder. Even assuming, without deciding, that partial verdicts as to multiple charges are permissible in North Carolina, we hold that a trial court may not take partial verdicts as to theories of a crime. We cannot reconcile *Thomas*—and its proposition that "defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes"— with what the trial court did in this case. *Id.*, 386 S.E.2d at 561.

This holding is further supported by the Supreme Court's decision in *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78 (1982). In *Booker*, the jury in the defendant's first trial had been unable to reach a verdict, but had indicated in a note that it was deadlocked on second degree murder. After a mistrial was declared and the defendant was retried, the defendant argued on appeal that North Carolina should adopt the New Mexico rule requiring in cases involving lesser included offenses that a trial court submit to a deadlocked jury verdict sheets indicating whether the jury had unanimously voted for acquittal on any of the greater or lesser included offenses. *Id.* at 305, 293 S.E.2d at 80. The Supreme Court "reject[ed] this request" because it was "of the opinion that the better reasoned rule is the majority rule which requires *a final verdict* before there can be an implied acquittal." *Id.* (emphasis original).

We see no material difference between the New Mexico rule and the procedure followed in this case. When a jury is deadlocked, the New Mexico rule in effect calls for the taking of partial "verdicts" on greater and lesser included offenses with respect to a single charge even though there is no unanimity as to whether the defendant should be convicted of the charged offense. In other words, the New Mexico rule attempts to establish unanimity on aspects of a charged crime in advance of a final verdict on the charged crime. That is precisely what the trial court's procedure in this case was designed to accomplish.

The jury was not yet in agreement with respect to the charge of first degree murder. The trial judge was, however, concerned that something might occur overnight and, for that reason, had the jury complete verdict sheets setting out the theories on which the jury was unanimous. The jury did not, however, render a final verdict on the single first degree murder charge, but continued to deliberate the next day. If, as the Supreme Court stated in *Booker*, there must be a final verdict before there can be an acquittal, there must be a final

verdict before there can be a conviction. The jury in this case did not, on Tuesday, return a final verdict as to first degree murder; rather, it expressed unanimity as to two theories of first degree murder.

Even though we have concluded that the trial court erred in taking partial "verdicts" as to two of the first degree murder theories, we must still decide whether that error is harmless. Because this issue involves defendant's constitutional right to a unanimous jury verdict, the State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2009).

The State argues that when the jury rendered its "verdicts" on lying in wait and felony murder, "[t]he jury's consideration of (and final unanimous agreement on) the theory of malice, premeditation, and deliberation then became moot so far as defendant's conviction of first degree murder was concerned. Conviction based on that theory as well would have been relevant only to our Supreme Court's proportionality review had this defendant been sentenced to death." This argument, however, disregards the importance of the potential of juror compromises during the jury's deliberations.

In *Booker*, our Supreme Court quoted with favor the rationale of the Michigan Court of Appeals decision in *People v. Hickey*, 103 Mich. App. 350, 303 N.W.2d 19 (1981), as supporting the Supreme Court's decision to reject the New Mexico rule and require a final verdict:

> "Defendant's conviction followed a second trial on the charge of first-degree murder, the first trial having ended in a mistrial due to a hung jury. At the first trial, the jury was instructed that it could return one of four possible verdicts: guilty of first-degree murder, guilty of second-degree murder, guilty of voluntary manslaughter, or not guilty. When the jury indicated to the court that it could not reach a unanimous verdict, defense counsel requested that the trial court inquire as to whether the jury had reached a decision concerning defendant's guilt or innocence on any of the charges submitted to it. The trial court refused to make such an inquiry.

> Defendant contends that his second trial on the charge of murder was barred by art 1, § 15 of the Michigan Constitution, and by the Fifth Amendment to the United States Constitution, which provide that a person may not be placed twice in jeopardy for the same offense. Defendant argues that the trial court's failure to inquire as to the status of the jury's deliberations on the

various possible verdicts submitted to it prevented the court from discovering whether the jury had decided that defendant was innocent of all charges except manslaughter. Defendant urges the adoption of the rule announced in *State v Castrillo*, 90 NM 608; 566 P 2d 1146 (1977), where it was held that where a jury announced its inability to reach a verdict, and the trial court failed to determine whether the jury had unanimously voted for acquittal on any of the included offenses, jeopardy attached as to all charges except the charge of voluntary manslaughter, the least of the included offenses. The New Mexico court held that there is no plain and obvious reason to declare a mistrial as to any included offense upon which the jury has reached a unanimous agreement of acquittal. Consequently, the Court ruled that when a jury announces its inability to reach a verdict in a case involving included offenses, the trial court is required to submit verdict forms to the jury to determine if it has unanimously voted for acquittal on any of the included offenses, and the jury may then be polled with regard to any verdict thus returned.

Other jurisdictions have examined defendant's argument and rejected it. See, *Walters v State*, 255 Ark 904; 503 SW 2d 895 (1974), *cert den* 419 US 833; 95 SCt 59; 42 LEd 2d 59 (1974), *People v Griffin*, 66 Cal 2d 459; 58 Cal Rptr 107; 426 P 2d 507 (1967), *People v Doolittle*, 23 Cal App 3d 14; 99 Cal Rptr 810 (1972), *People v Hall*, 25 Ill App 3d 992; 324 NE 2d 50 (1975), *State v Hutter*, 145 Neb 798; 18 NW 2d 203 (1945). *We conclude that polling the jury on the various possible verdicts submitted to it would constitute an unwarranted and unwise intrusion into the province of the jury. As was noted by the California Supreme Court in Griffin, supra, it must be recognized as a practical matter that jury votes on included offenses may be the result of a temporary compromise in an effort to reach unanimity. A jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should not be given to any jury action that is not returned in a final verdict.*"

*Booker*, 306 N.C. at 305-06, 293 S.E.2d at 80-81 (quoting *Hickey*, 103 Mich. App. at 351-53, 303 N.W.2d at 20-21) (emphasis original).

Other courts, in evaluating the risks of taking partial verdicts, have echoed such concern about protecting the province of the jury to revisit previously held views in the course of reaching a final ver-

dict. *See, e.g., United States v. Benedict*, 95 F.3d 17, 19 (8th Cir. 1996) ("The danger inherent in taking a partial verdict is the premature conversion of a tentative jury vote into an irrevocable one. It is improper for a trial court to intrude on the jury's deliberative process in such a way as to cut short its opportunity to fully consider the evidence. Such an intrusion would deprive the defendant of the very real benefit of reconsideration and change of mind or heart." (internal citations and quotation marks omitted)); *People v. Richardson*, 184 P.3d 755, 763-64 (Colo. 2008) ("[I]n the case where a jury has not completed deliberations at the time of the partial verdict instruction, the resulting verdict might well be the result of juror coercion—a particular concern where, as here, the jury is deadlocked."); *Caldwell v. State*, 164 Md. App. 612, 642-43, 884 A.2d 199, 216 (2005) ("[A] verdict must be unambiguous and unconditional and must be final—in the sense of not being provisional or tentative and, to the contrary, being intended as the last resolution of the issue and not subject to change in further deliberation. A verdict that is tentative . . . is defective and not valid. In deciding whether to accept a partial verdict, a trial judge must guard against the danger of transforming a provisional decision into a final verdict.").

We think that the same concerns raised in taking partial verdicts (whether as to lesser included offenses or to individual charges of a multiple count indictment), are equally triggered by the taking of partial "verdicts" on theories of first degree murder. Here, after the jury had submitted its verdict sheets on Tuesday evening, it was not permitted on Wednesday to reconsider those earlier decisions and was left to consider the theory of premeditation and deliberation essentially in a vacuum. Indeed, the jury was given a whole new verdict sheet limited to premeditation and deliberation. Because the jury's decisions on the theories of lying in wait and felony murder, at that moment in time, were not in themselves convictions, but rather were *bases* for a conviction, we find troubling the possibility that taking separate decisions on the theories may have "cut short [the jury's] opportunity to fully consider the evidence . . . [or] deprive[d] the defendant of the very real benefit of reconsideration and change of mind or heart." *Benedict*, 95 F.3d at 19 (internal quotation marks omitted).

We conclude that this intrusion into the province of the jury cannot be deemed harmless beyond a reasonable doubt. We do not know what the jury ultimately would have decided had it been permitted to continue deliberating about *all* the theories of first degree murder.

The record indicates that the jury had been periodically asking the court for reinstruction and was still engaged in fruitful deliberation by the time the court solicited verdicts at the end of the first day of deliberation. Many of the jury's questions focused on the murder charge, requesting explanation of each of the theories as well as the definition of "in concert." Additionally, the jurors apparently harbored significant doubt about Triplett's testimony. Their question about the consequences of perjury to "a witness who made a plea agreement with the State" could only have applied to Triplett.

We find merit in defendant's contention that the outcome may have been different if the jury had been able to continue deliberating on all three theories. For example, on the second day of deliberation, those jurors previously not willing to find defendant guilty of first degree murder based on premeditation and deliberation may have been persuaded to change their position based on the fact that "verdicts" of first degree murder had already been rendered. Even if no partial verdicts had been taken and defendant had still been convicted of first degree murder based on one, but not all, of the theories, that result would have had ramifications for sentencing whether before the jury, had the State continued to proceed capitally, or before the trial judge in non-capital sentencing.

We find persuasive the reasoning applied in *Benedict*. In *Benedict*, 95 F.3d at 18, the Eighth Circuit held that partial verdicts had been taken in error when the trial court, over the defendant's objection, took verdicts on three counts (conspiracy to burglarize a post office, aiding and abetting post office burglary, and aiding and abetting theft of post office property) when the jury indicated, after approximately eight hours of deliberation, that it had agreed on three counts, but was still undecided on a fourth count (conspiracy to steal post office property). The trial court "entered as final judgments" the verdicts on the three counts and denied the defendant's motion for a mistrial on the fourth count. *Id.* at 18-19. Ultimately, after deliberating further, the jury was still deadlocked on the final count, and the government dismissed that count. *Id.* at 19.

On appeal, the Eighth Circuit expressed concern over the short length of time spent deliberating before the trial court took partial verdicts, the indication that the jury was progressing toward unanimity on the fourth count, the absence of a deadlock, and the lack of any request by the parties for partial verdicts. *Id.* at 19-20. The court also noted the close relationship between the fourth count and one of the counts that had already been decided:

It is difficult to imagine that the jury could continue to deliberate on the conspiracy charge without reweighing the evidence with respect to the substantive offense where, as here, the government's evidence on both counts was virtually the same. The jury expressed as much when it asked for clarification between the two charges.

*Id.* at 20. Although the court acknowledged that partial verdicts "may be appropriate in certain circumstances," the court concluded that the trial court had committed "error in the manner" in which it conducted deliberations and had abused its discretion by instructing the jury to deliver partial verdicts. *Id.* at 19-20.

Similar facts appear in this case. Here, deliberations had not been underway for a substantial amount of time given that this case involved a capital murder charge. The trial judge decided on his own volition, without request from the jury or the parties, to take verdicts before adjourning on the first afternoon of deliberation, solely because of the trial judge's concern that if "something happens over the evening hour I've got a problem." The jury had not arrived at a deadlock, but rather was still actively deliberating when the court requested the partial verdicts. Lastly, the court took "as final judgments" guilty verdicts on three of the charges and on two of the three theories of first degree murder. As was the case in *Benedict*, the three murder theories were all "so closely related" that "[i]t is difficult to imagine that the jury could continue to deliberate on [one theory] without reweighing the evidence with respect to" the other theories. *Id.* at 20. Under these circumstances, we must conclude the court's error was prejudicial.

Defendant is entitled to a new trial as to the murder indictment. Defendant does not argue any prejudice with respect to the trial court's taking partial verdicts on the charges of first degree kidnapping, robbery with a dangerous weapon, or burning of personal property. Therefore, we do not address whether the trial court properly took partial verdicts as to those charges. *See Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) ("It is not the role of the appellate courts . . . to create an appeal for an appellant.").

II

[2] Defendant contends, in addition, that the trial court erred when it barred him from introducing Dalrymple's September 2007 statement to Detective Rominger. Defendant argues that this statement

**STATE v. SARGEANT**

[206 N.C. App. 1 (2010)]

should have been admitted under the residual hearsay exception of Rule 803(5) of the Rules of Evidence.

There is no dispute that once Dalrymple asserted his Fifth Amendment rights when called by defendant to testify, Dalrymple was unavailable within the meaning of Rule 804. *See State v. Harris*, 139 N.C. App. 153, 158, 532 S.E.2d 850, 854 ("Where a witness is physically present at the trial, but asserts his Fifth Amendment right not to testify, he is considered 'unavailable' for the purpose of" Rule 804.), *disc. review denied*, 353 N.C. 271, 546 S.E.2d 850 (2000).

Since Dalrymple was unavailable, the trial court, in order to determine whether Dalrymple's statement was admissible under Rule 804(5), was required to undertake a six-step inquiry and determine (1) whether proper notice of the intent to use the statement had been given; (2) whether the statement did not fall within the scope of any other hearsay exception set out in Rule 804; (3) whether the statement exhibited circumstantial guarantees of trustworthiness equivalent to those required for other specific hearsay exceptions; (4) whether the statement was relevant to a material issue of fact; (5) whether the statement was more probative on the issue than any other evidence that the proponent could procure through reasonable efforts; and (6) whether the interests of justice would be served by the admission. *See State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986).

At the trial of this case, the State did not contest that the Dalrymple statement met five of the *Triplett* elements. The State contended only that defendant could not show that the statement had the required equivalent circumstantial guarantees of trustworthiness. Our Supreme Court has held:

> A trial judge should consider a number of factors in determining whether a hearsay statement possesses sufficient indicia of trustworthiness to be admitted under Rule 804(b)(5). Among these factors are: (1) the declarant's personal knowledge of the underlying event; (2) the declarant's motivation to speak the truth; (3) whether the declarant recanted; and (4) the reason, within the meaning of Rule 804(a), for the declarant's unavailability. . . . [T]his list is not inclusive and . . . other factors may be considered when appropriate. Among the many factors which courts have considered are the existence of corroborating evidence, and the degree to which the proffered testimony has elements of enumerated exceptions to the hearsay rule.

*State v. Nichols*, 321 N.C. 616, 624-25, 365 S.E.2d 561, 566-67 (1988) (internal citations omitted). The trial court is required to make specific findings of fact and conclusions of law regarding these factors. *Triplett*, 316 N.C. at 9, 340 S.E.2d at 741.

In this case, the trial court, in support of its decision to exclude the Dalrymple statement, read the following findings of fact and conclusions of law into the record:

> It is clear from the evidence presented on behalf of the State that Mr. Dalrymple was present during at least some of the events in question and therefore, he would have personal knowledge.
>
> Second would be the declarant's motivation to speak the truth. It appears to the Court that [Dalrymple] by refusing to testify has kept the death penalty in play in his own criminal case and therefore has acted against his own self interests by refusing to testify when called by the defense in this matter.
>
> The third thing the Court is supposed to determine is whether the defendant has recanted his testimony. While the defendant has an unlimited right to assert the Fifth Amendment, the Court concludes that his refusal to testify while not a recantation is a factor considered by the Court not only in his trustworthiness but in the fourth reason, that being the reason that he is unavailable. The Court has considered that his refusal to testify is a voluntary him [sic] making himself unavailable and would put the Court in [sic] position in every case where a co-defendant makes an out of Court statement that could be under some circumstances considered exculpatory as to that co-defendant against another co-defendant admissible into evidence even though its [sic] an unsworn statement by the co-defendant simply taking the Fifth Amendment and refusing to testify and not being subject to cross-examination. The Court has also noted that in the defendant's statement on the—given to the Detective Rominger on September 9 or apparently transcribed September 10th that in Paragraph Number Four that the witness Dalrymple has stated that he saw [sic] "saw Kyle moving around in the interior part and then it went into flames. Kyle moved to the trunk and then it went into flames." The Court does not recall there being any testimony of the interior of the car being ignited or there being any fire damage but there was smoke damage to the interior but there was no evidence that the Court has yet heard that would indicate that there was any interior damage due to a fire. That would indicate

to the Court some reservation concerning the trustworthiness of the statement made by Mr. Dalrymple.

Having considered all the factors enumerated in *State versus Nichols* and *State versus Triplett* the Court is not satisfied that the statement by Mr. Dalrymple is trustworthy and therefore defendant's motion to admit the statement under Rule 804 and have the declarant declared unavailable is denied.

Thus, the trial court found the existence of the first factor (personal knowledge). It is unclear what precisely the trial court found with respect to the existence of the second factor (motive to speak the truth), or whether the trial court made any finding at all regarding the third factor (recanting). It appears that the court primarily based its decision not to admit the statement on the fourth factor. Because there is no dispute by the parties that Dalrymple had the required personal knowledge, we focus our review on the findings related to the second, third, and fourth factors.

With respect to the second factor, Dalrymple's motive to speak the truth, the trial court does not explain whether it believed Dalrymple's acting against his own interests by not testifying suggests that Dalrymple had a motive to tell the truth or a motive to dissemble. In addition, this finding lacks evidentiary support because it assumes that by refusing to testify in this case, Dalrymple lost the benefit of his agreement with the State—in other words, that Dalrymple's refusal to testify meant that he was again subject to the death penalty. The State, on appeal, acknowledges that this assumption was in error: "The State believes that the trial court misread or misapprehended the State's agreement with Dalrymple when it found that Dalrymple 'has kept the death penalty in play in his own criminal case . . . by refusing to testify when called by the defense.' As noted above, the agreement said nothing about charging consequences if Dalrymple was called as a defense witness . . . ." (Internal citation omitted.) Finally, this finding erroneously focuses on Dalrymple's actions at the time of the trial rather than on whether he had a motive to tell the truth at the time he made his 10 September 2007 statement. We, therefore, hold that the trial court erred in making this finding of fact.

With respect to whether Dalrymple ever recanted the 10 September 2007 statement (the third factor), the trial court recited the factor, but then made no specific finding other than noting that Dalrymple voluntarily chose to assert his Fifth Amendment rights.

The record contains no evidence that Dalrymple ever recanted his statement. To the extent that the trial court was suggesting that Dalrymple's refusal to testify amounted to a recantation, such a finding cannot be supported. In exchange for Dalrymple's agreement to make himself available to testify if called by the State, the State only agreed to take the death penalty off the table. Dalrymple was still subject to being tried for murder with a possible resulting lengthy sentence. Under the agreement, the State could not use the September 2007 statement in any prosecution of Dalrymple, but it could still use testimony given by Dalrymple in any other proceedings. Since Dalrymple had not yet been tried at the time of defendant's trial, he had no realistic choice but to assert his Fifth Amendment rights since, if he testified, he would provide the State with admissions that could then be used to convict him in his own trial. His assertion of his Fifth Amendment rights, therefore, has no bearing on the question whether Dalrymple ever recanted. We, therefore, hold that the trial court erred in failing to find that Dalrymple never recanted his September 2007 statement.

Turning to the final factor, the reason for Dalrymple's unavailability, the trial court apparently considered Dalrymple's assertion of his Fifth Amendment rights as a basis for concluding that his statement lacked guarantees of trustworthiness equivalent to those required by other hearsay exceptions. The bare fact that unavailability is due to the Fifth Amendment cannot, however, without more, justify a finding of a lack of trustworthiness since statements falling within other exceptions under Rule 804, such as a statement against interest, would be admissible even though the basis for unavailability was an assertion of Fifth Amendment rights.

Although it is not entirely clear, when we consider the trial court's finding as to the second factor (motive to tell the truth) with this factor, it appears that the trial court's concern was that co-defendants, such as Dalrymple, could strategically assert their Fifth Amendment rights specifically so that a prior statement exculpating a defendant could be admitted into evidence. The trial court's finding that Dalrymple had acted contrary to his own interest in refusing to testify suggests that the trial court thought Dalrymple had some other motive, such as aiding defendant, in invoking the Fifth Amendment. As noted above and acknowledged by the State, however, the trial court misread the agreement. In fact, refusing to testify was entirely consistent with Dalrymple's personal interests. The trial court, therefore, also erred with respect to the fourth factor.

The trial court next found that one aspect of Dalrymple's statement was inconsistent with the trial testimony. While *Nichols* noted that one factor considered by courts was the existence of evidence corroborating the hearsay statement, the Supreme Court subsequently held that this Court, in applying Rule 804(5), "improperly referenced the hearsay statement's consistency with *other statements admitted at trial* where the proper analysis is whether the statement to the detective, standing alone, was inherently trustworthy." *State v. Finney*, 358 N.C. 79, 84, 591 S.E.2d 863, 866 (2004) (emphasis added). Accordingly, the trial court erred in determining the trustworthiness of the September 2007 statement by comparing it to other evidence presented at trial.

In sum, only one of the trial court's findings of fact relating to the trustworthiness of the September 2007 statement is supported by competent evidence and the law. That finding—that Dalrymple had personal knowledge—is contrary to the trial court's conclusion of law that the statement lacked trustworthiness within the meaning of *Nichols* and *Triplett*. Given the trial court's findings of fact, we must conclude that the court's exclusion of Dalrymple's September 2007 statement was in error.

We cannot find this error harmless. Triplett testified that defendant was the leader with respect to the murder, kidnapping, robbery, and burning of personal property. Dalrymple's statement would have painted a very different picture, with Triplett initiating the attack and murder and being substantially in control with respect to the remaining offenses. It is apparent that the jury had serious doubts about Triplett's credibility since they asked the trial court: "Are there any possible consequences/punishments/repercussions to a witness for lying under oath? Specifically a witness who made a plea agreement with the State?" Given the stark differences between Triplett's testimony and Dalrymple's statement together with the jury's question suggesting its belief that Triplett was lying under oath, it is reasonably possible that the jury would have reached a different verdict had it been able to consider Dalrymple's statement. *See* N.C. Gen. Stat. § 15A-1443(a) (2009).

Although we have already granted a new trial on the charge of first degree murder, we now grant a new trial on the remaining charges based on the exclusion of Dalrymple's statement. Because of our disposition of these first two issues, we need not address defendant's final contention that the trial court allowed the State to engage

in prosecutorial misconduct or discriminatory use of immunity in connection with the State's agreement with Dalrymple.

New trial.

Judge STROUD concurs.

Judge ERVIN dissents in a separate opinion.

ERVIN, Judge, dissenting.

Although I fully agree with the Court that trial judges would be well-advised to avoid accepting separate verdicts concerning the various theories of first degree murder that are submitted for the jury's consideration at separate times and that the trial court's findings and conclusions concerning the admissibility of Mr. Dalrymple's statement contain a number of errors, I cannot agree with the Court's conclusion that the manner in which the trial court took the jury's verdict violated Defendant's constitutional right to trial by jury guaranteed by Article I, section 24. Moreover, even if the trial court's action constituted an error of constitutional dimensions, I believe that, on the facts of this case, any such error was harmless beyond a reasonable doubt. Finally, despite my concerns about the trial court's findings and conclusions, I am not persuaded that Mr. Dalrymple's statement was admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5). As a result, I respectfully dissent from the Court's decision to grant Defendant a new trial in the case in which he was convicted of first degree murder.

## I.  Separate Verdict Issue

Although the majority finds that the trial court's decision to take separate verdicts at separate times on the three theories under which the evidence permitted Defendant to be convicted of first degree murder violated his state constitutional right to trial by jury, it is not clear to me why the majority reaches this conclusion. Just as the majority finds there to be no authority condoning the practice in which the trial court engaged in this case, there is also no authority that explicitly prohibits it. Instead, as best I have been able to ascertain, the present issue is one of first impression in this jurisdiction. As a result, in order to reach the conclusion that the trial court's action violated Article I, section 24 of the North Carolina Constitution, the Court relies on the uncontroverted fact that a defendant is charged with,

**STATE v. SARGEANT**

[206 N.C. App. 1 (2010)]

and convicted of, criminal offenses rather than theories of liability; points out that trial judges include multiple theories of liability on the verdict sheets that are submitted for the jury's consideration for reasons that are primarily related to the imposition of sentence; and contends that the trial court's action is inconsistent with the decision of the Supreme Court in *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78 (1982). I am not, however, persuaded that the Supreme Court's logic establishes that an error of constitutional dimension occurred in this case.

The fact that "defendants are not convicted or acquitted of theories [but] are convicted or acquitted of crimes," *State v. Thomas*, 325 N.C. 583, 593, 386 S.E.2d 555, 561 (1989), while well-established, does not seem to me to be particularly relevant to the issue that is before us. As the Court notes, the primary purpose of requesting a jury to specify the theory upon which it convicts a defendant of first degree murder relates to sentencing issues rather than to issues relating to the defendant's guilt. *State v. Millsaps*, 356 N.C. 556, 560, 572 S.E.2d 767, 770-71 (2002) (stating that the extent to which a predicate felony used to support the defendant's conviction of first degree murder under a felony murder theory can be used as an aggravating factor during a capital sentencing hearing depends upon whether the jury also found that the defendant acted with premeditation, and deliberation); *State v. Norwood*, 303 N.C. 473, 480, 279 S.E.2d 550, 555 (1981) (stating that, in the event that the defendant was convicted of first degree murder on the basis of premeditation and deliberation as well as under the felony murder rule, the trial court could properly impose a separate sentence upon the defendant for the predicate felony). The majority's argument overlooks the fact that, once the jury has found unanimously and beyond a reasonable doubt that a defendant committed first degree murder under any theory, he or she has been convicted of first degree murder.[1] As a result, while I agree with the Court that we are not talking about true partial verdicts in this case (for that reason, I will describe the approach taken by the trial court in this case as the taking of separate verdicts in the remainder of this opinion), I am not convinced that the fact that defendants are convicted of offenses rather than theories sheds a great deal of light on the extent to which the trial court's actions in this case violated Article I, section 24 of the North Carolina Constitution.

---

1. The verdict sheet contained in the record reflecting the jury's verdicts on the felony murder and lying in wait issues reflects, at its very top, that the jury found that Defendant was guilty of first degree murder.

The fact that the verdicts that the jury rendered on the various theories of liability submitted for its consideration would impact the sentences to which Defendant was exposed, while true, does not strike me as particularly relevant to the lawfulness of the trial court's action. The lawfulness of the trial court's action, it seems to me, should hinge upon the proper interpretation of the relevant constitutional or statutory provisions rather than upon the impact of the approach adopted by the trial court upon the sentences imposed upon Defendant, which is generally governed by double jeopardy or statutory construction considerations. As a result, while a premature decision to accept a guilty verdict with respect to one or more theories of guilt might, under some circumstances not present here,[2] call the trial court's ability to impose a separate, consecutive sentence for kidnapping into question, it does not, at least in my opinion, have any bearing on the extent to which the trial court erred by accepting separate verdicts in the present case.

Thirdly, I do not share the Court's concern that the trial court's action was inconsistent with the Supreme Court's decision in *Booker*. In *Booker*, the defendant contended that, in light of a note that the foreperson sent to the trial judge to the effect that the jury was deadlocked on the issue of the defendant's guilt of second degree murder, "the jury had implicitly found the defendant not guilty of first-degree murder" and that he should not have been retried for that offense based on double jeopardy considerations. *Booker*, 306 N.C. at 304, 293 S.E.2d at 79. In rejecting the defendant's argument, the Supreme Court pointed out that "the better reasoned rule is the majority rule ' which requires a *final verdict* before there can be an implied acquittal." *Id.*, 306 N.C. at 305, 293 S.E.2d at 80. As support for this conclusion, the Supreme Court in *Booker* quoted the decision of the Michigan Court of Appeals in *People v. Hickey*, 103 Mich. App. 350, 35 303 N.W.2d 19 (1981), in which the Court stated that "polling the jury on the various possible verdicts submitted to it would constitute an unwarranted and unwise intrusion into the province of the jury," since, "as a practical matter," "jury votes on included offenses may be the result of a temporary compromise in an effort to reach unanimity" and since "[a] jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should

---

2. The fact that one of the first two verdicts which the trial court accepted in the homicide case involved the jury's determination that Defendant was guilty of first degree murder under a lying in wait theory eliminates any concern that the delay in the jury's decision on the premeditation and deliberation issue in any way prejudiced Defendant.

not be given to any jury action that is not returned in a final verdict." I do not believe that *Booker* sheds much light on the present issue, since the trial court did not, in this case, question the jury about its decision about the issue of Defendant's guilt of lesser included offenses. Put another way, *Booker* involved a request that the trial judge question the jury about inchoate decisions that might have been made by the jury during its discussions rather than about any sort of final verdict that the jury might have reached. In this instance, however, the trial court ascertained that the jury had reached final verdicts on the issues of Defendant's guilt of all of the charges except the first degree murder charge and that it had reached verdicts as to two of the three theories of liability that had been submitted for its consideration with respect to that charge. As a result, the trial court's action in this case, which amounted to accepting verdicts from the jury with respect to issues about which the jury indicated that it had reached a decision, is simply not similar to those that the Supreme Court refused to countenance in *Booker*. Thus, none of the three arguments that the Court advances in support of its conclusion that the action taken by the trial court in this instance violated Article I, section 24 of the North Carolina Constitution persuade me that a constitutional violation actually occurred.

The total absence of any authority shedding any direct light on the claim that Defendant has presented for our review necessitates an examination of the aims and purposes of Article I, section 24 of the North Carolina Constitution, which provides that "[n]o person shall be convicted of any crime but by the unanimous verdict of a jury in open court," while preserving the General Assembly's right to "provide for other means of trial for misdemeanors, with the right of appeal for trial *de novo*." "It is not questioned either that trial by jury is deeply rooted in our institutions or that the term 'jury' as understood at common law and as used in the Constitution imports a body of twelve [persons] duly summoned, sworn, and impaneled for the trial of issues joined between litigants, in a civil action[,] or for the determination of facts adduced for and against the accused in a criminal case." *State v. Dalton*, 206 N.C. 507, 512, 174 S.E. 422, 424-25 (1934) (citations omitted). If a practice "preserves the essential attributes of trial by jury, number, impartiality, and unanimity [citation omitted], it cannot be said to impair the common law right as guaranteed by the Constitution." *Id.*, 206 N.C. at 512, 174 S.E. at 425; *see also State v. Fowler*, 312 N.C. 304, 308, 322 S.E.2d 389, 392 (1984) (stating that "our constitution has been interpreted to require a jury of twelve and a unanimous verdict") (citing *State v. Hudson*, 280

N.C. 74, 79, 185 S.E.2d 189, 192 (1971), *cert. denied*, 414 U.S. 1160, 39 L. Ed. 2d 112 (1974)). The issues that have been addressed by the Supreme Court and this Court in cases involving alleged violations of Article I, section 24 of the North Carolina Constitution have included claims such as those involving the use of disjunctive jury instructions, *State v. Diaz*, 317 N.C. 545, 346 S.E.2d 488 (1986); the delivery of instructions to a single juror instead of to the entire jury, *State v. Wilson*, 363 N.C. 478, 681 S.E.2d 325 (2009); *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985); issues arising from questions posed by the trial court to the jury during deliberations in which the trial court allegedly coerced the jury into reaching a verdict, *State v. Rasmussen*, 158 N.C. App. 544, 582 S.E.2d 44, *disc. review denied*, 357 N.C. 581, 589 S.E.2d 362 (2003); issues involving jury misconduct, *State v. Jackson*, 189 N.C. App. 747, 659 S.E.2d 73, *disc. review denied*, 362 N.C. 512, 668 S.E.2d 564 (2008), *cert. denied*, —— U.S.——, 173 L. Ed. 2d 662 (2009); and issues involving jury polling, *State v. Black*, 328 N.C. 191, 400 S.E.2d 398 (1991). As a result of the fact that Defendant does not contend that the trial court's actions resulted in a verdict returned by less than twelve jurors; adversely affected the jury's impartiality; permitted the jury to reach non-unanimous verdicts with respect to any theory of liability; or coerced the jury into reaching unanimous verdicts with respect to these theories in any way, Defendant's claim does not resemble any of the grounds for appellate relief typically urged upon us under Article I, section 24 of the North Carolina Constitution.

As a result of my inability to foresee all possible ways in which the approach adopted by the trial court in this instance might impinge upon jury unanimity considerations, I am unwilling to hold that accepting separate verdicts would never be a violation of Article I, section 24 of the North Carolina Constitution. However, in order for such a violation to occur, I believe that the trial court's action would have to implicate one of the attributes of a jury trial set out in *Dalton*, 206 N.C. at 512, 174 S.E. at 425. In making this determination, I believe that the Court must examine the relevant facts on a case-by-case basis. Such an approach would be consistent with the "totality of the circumstances" approach that has been adopted by the Supreme Court for addressing cases in which trial judges allegedly questioned the jury in such a manner as to coerce it into reaching a guilty verdict. *Fowler*, 312 N.C. at 308, 322 S.E.2d at 392. As a result, "[t]he actions of the trial judge in context and under all the circumstances presented must be reviewed to determine if a judge's instructions and actions had a coercive effect," *United States v. Taylor*, 19 Fed. Appx. 62, 65 (4th Cir. 2001) (citing *Jenkins v. United States*, 380 U.S. 445,

446, 13 L. Ed. 2d 957, 958 (1965)), or otherwise adversely impacted the attributes of a jury trial protected by Article I, section 24 of the North Carolina Constitution. In light of that standard, a trial judge should carefully consider any decision to accept partial or separate verdicts, making sure that he or she "neither pressure[s] the jury to reconsider what it had actually decided nor force[s] the jury to turn a tentative decision into a final one." *United States v. Wheeler*, 802 F.2d 778, 781 (5th Cir. 1986) (citing *United States v. DiLapi*, 651 F.2d 140, 146-47 (2d Cir. 1981), *cert. denied*, 455 U.S. 938, 71 L. Ed. 2d 648 (1982)). Given the risks inherent in taking partial or separate verdicts, I would strongly discourage members of the trial bench from taking such verdicts. However, I am unable, after carefully considering the attributes protected by Article I, section 24 of the North Carolina Constitution, to conclude that engaging in the practice of taking partial or piecemeal verdicts constitutes a *per se* violation of that constitutional provision and believe that we must evaluate the lawfulness of taking such verdicts based on the totality of the circumstances.

The approach I have suggested for evaluating claims of the nature advanced by Defendant in this case is consistent with the approach that the federal courts have adopted in cases involving the taking of partial verdicts.[3] The federal courts have authorized trial judges to take partial verdicts in cases involving multiple criminal offenses. Fed. R. Crim. P. 31(b)(2); *see also United States v. Benedict*, 95 F.3d 17, 19 (8th Cir. 1996) (stating that, in the federal courts, "the practice of taking a partial verdict in a single-defendant case is not *per se* invalid," while reviewing the trial court's decision in the case in question for an abuse of discretion and finding that such an abuse of discretion occurred under the facts of that case) (citing *United State v. Ross*, 626 F.2d 77, 81 (9th Cir. 1980) (stating that "it is settled that a trial court may accept a partial verdict on only one of two or more counts of an indictment"); *United States v. DeLaughter*, 453 F.2d 908, 910 (5th Cir.), *cert. denied*, 406 U.S. 932, 32 L. Ed. 2d 135 (1972) (stating that "[i]t is also permissible for a jury, as here, to render a partial verdict; a court may accept a jury's verdict as to one count and declare a mistrial as to another upon which no agreement has been reached"); *United States v. Barash*, 412 F.2d 26, 31-32 (2d Cir.), *cert. denied*, 396 U.S. 832, 24 L. Ed. 2d 82 (1969) (stating that "[t]he prac-

---

3. Admittedly, the federal courts are not applying a constitutional standard in these cases. However, since the concerns that led to the challenges advanced against the partial verdicts challenged in those cases are similar to the concerns that have motivated Defendant's challenge to the separate verdicts at issue here, I believe that these cases shed some light on the issues that are before us in this case.

tice of sending the jury back for further deliberations on unresolved counts has been followed in this circuit since *United States v. Cotter*, 60 F.2d 689, 690-91 (2d Cir.), *cert. denied*, 287 U.S. 666, 77 L. Ed. 575 (1932), and we adhere to that practice here"). As a result, while these cases are distinguishable in that they address partial verdicts dealing with different charges rather than separate verdicts dealing with separate theories of guilt, it is clear that the federal courts have not, as best I can tell, condemned the basic practice employed by the trial court in this case out of hand but have, instead, chosen to evaluate the taking of partial verdicts on a case-by-case basis of the type that I believe to appropriately reflect the approach that should be adopted under Article I, section 24 of the North Carolina Constitution.

At bottom, the Court's concern in this case appears to be that, by taking separate verdicts on a theory-by-theory basis, the trial court precluded the jury from reconsidering their decisions with respect to the issues of Defendant's guilt under a felony murder and lying in wait theory during their deliberations on the issue of Defendant's guilt under a premeditation and deliberation theory. After carefully considering the record, I am simply unable to agree that the Court's concerns are well-founded given the facts that we have before us in this case. I reach this conclusion for a number of different reasons.

First, and perhaps most importantly, the jury effectively asked to be permitted to deliberate on a theory-by-theory basis. Before the end of the first day of deliberations, the jury had asked to be reinstructed on a particular theory, to deliberate on that theory until it reached a decision, and to repeat that process with the next theory. As a result, at least in this case, the jury had already decided to approach each theory of liability separately and to reach a decision with respect to that theory before moving on to the next one. Thus, the trial court's decision to take separate verdicts in this case merely reflected an approach that the jury had already adopted.

Secondly, unlike the situation in *Benedict*, upon which the Court places considerable reliance, the factors that are relevant to determining Defendant's guilt of first degree murder under a lying in wait or felony murder theory are not particularly interrelated with the considerations that are critical to the issue of Defendant's guilt of first degree murder under a premeditation and deliberation theory. As a general proposition, the first two theories focus on what Defendant did, while the third theory focuses on the state of mind with which he acted. As a result, the process adopted here does not seem to me to

have "intrude[d] on the jury's deliberative process in such a way as to cut short its opportunity to fully consider the evidence." *Benedict*, 95 F.3d at 19. Simply put, the jury could, with complete logical consistency, return a verdict in this case finding that Defendant was not guilty of first degree murder on the basis of premeditation and deliberation after finding that Defendant was guilty of first degree murder on the basis of felony murder and lying in wait.

Thirdly, the record suggests that the jury had, in fact, reached final verdicts with respect to the issue of Defendant's guilt of first degree murder on the basis of felony murder and lying in wait by the end of the first day of deliberations. According to the transcript, the jury had completed that portion of the verdict form indicating its determination that Defendant was guilty of first degree murder under a felony murder and a lying in wait theory at the time that the trial court inquired as to whether the jury had reached a verdict on any issues (although the necessary signature had not been affixed to one or more verdict sheets, causing the trial court to send the jury back out for the purpose of ensuring that the verdict sheets were properly signed). As a result, contrary to the Court's suggestion that the jury might well have changed its mind on the issue of Defendant's guilt of first degree murder under a felony murder or lying in wait theory during its deliberations on the issue of his guilt of first degree murder on the basis of premeditation and deliberation, the record tends to suggest that the jury had already completed the portions of the verdict sheet dealing with the felony murder and lying in wait issues before beginning its deliberations concerning the issue of his guilt of first degree murder on the basis of premeditation and deliberation.

Fourth, I do not believe that this Court, the Supreme Court, or the General Assembly intends to encourage compromise verdicts of the sort mentioned in *Hickey*. Instead, it is my impression that jurors are supposed to base their decisions on a thorough analysis of the evidence in light of the legal principles embodied in the trial court's instructions. N.C. Gen. Stat. § 15A-1235(b)(4) (stating that among the instructions that a trial court may deliver to deliberating jurors is that "[n]o juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict"); *see also State v. Alston*, 294 N.C. 577, 596, 243 S.E.2d 354, 366 (1978) (stating that the trial court's instruction "was amply sufficient to convey to each member of the jury that he should not surrender any conscientious conviction in order to reach a unanimous verdict"). For that reason, I

am more than slightly reluctant to base a decision on the prospect that members of the jury would engage in horse-trading with each other in order to reach compromise verdicts. Although individual jurors may, in fact, engage in such activities during the process of deliberating, I do not believe that we should encourage such conduct by the way that we decide the cases that come before us.

Finally, the trial court polled the jury after taking the separate verdicts at the end of the first day of deliberations and repeated the procedure before the jury resumed its deliberations on the following morning in light of a recording error. On both occasions, each member of the jury indicated that the verdicts reported by the jury foreperson were his or her verdicts and that he or she still assented to them. *See Black*, 328 N.C. at 191, 400 S.E.2d at 398 (stating that polling is a means of ensuring that a juror has not changed his or her mind). The fact that the members of the jury had an opportunity to reconsider the verdicts which the trial court accepted at the conclusion of the first day of deliberations before resuming deliberations on the following morning provides further indication that the concern that motivates the majority to overturn Defendant's first degree murder conviction is not operative in this case. As a result, for all of these reasons, I do not believe that the trial court's decision to accept separate verdicts concerning the issue of Defendant's guilt of first degree murder on the basis of lying in wait and the felony murder rule violated Article I, section 24 of the North Carolina Constitution.

Even if the trial court's action violated Article I, section 24 of the North Carolina Constitution, I am satisfied that any such error was harmless beyond a reasonable doubt. There is no question but that the jury found Defendant guilty of first degree murder on the basis of three different theories of liability. In order for there to have been any harm to Defendant from the approach adopted by the trial court, the jury would have had to have found, during its further deliberations in connection with the issue of Defendant's guilt of first degree murder on the basis of premeditation and deliberation, either that Defendant was not guilty of first degree murder at all or that Defendant was not guilty of first degree murder on the basis of any theory except the felony murder rule (in which case, as the Court notes, he would be entitled to a new sentencing hearing in the cases in which he was convicted of the predicate felonies used to support his first degree murder conviction under the felony murder rule). I am simply not persuaded, for all of the reasons that convince me that the trial court did not violate Article I, section 24 in the first place, that there is any

chance that either of these outcomes would have occurred had the trial court not accepted the separate verdicts which are at issue here. The fact that the jury asked to proceed on a theory-by-theory basis convinces me that it is very unlikely that, after finishing its deliberations with respect to one theory, it would have gone back and revisited its decision with respect to a previously-considered theory during its discussion of a later one. My conclusion to this effect is bolstered by the fact that the jury had already completed the relevant portions of the verdict sheet at the time that the trial court proposed taking the separate verdicts and the fact that the considerations that are relevant to the issue of Defendant's guilt of first degree murder under a premeditation and deliberation theory are significantly different than the issues that must be addressed in determining his guilt of first degree murder under a felony murder or lying in wait theory. Finally, the lack of hesitancy expressed by any member of the jury during the polling process, even after having overnight to think about the possible ramifications of the jury's decision, gives me further confidence that any error committed by the trial court in taking the separate verdicts was harmless beyond a reasonable doubt. At most, the only verdict that was defective was the jury's verdict on the issue of Defendant's guilt of first degree murder on the basis of premeditation and deliberation, and there is no need to disturb the trial court's judgments even if that verdict is set aside given that the jury's decision to find Defendant guilty of first degree murder on the basis of lying in wait is sufficient to support the separate sentence imposed upon Defendant for the predicate felonies used to support his first degree murder conviction under the felony murder rule.

Thus, for all of these reasons, I conclude that, given the unusual facts present here, the trial court did not violate Article I, section 24 of the North Carolina Constitution by taking the jury's verdicts in the manner in which they were taken in this case and that, even if the manner in which the verdicts were taken was erroneous, any such error was harmless beyond a reasonable doubt. Since the Court concludes otherwise, I respectfully dissent from its decision to award Defendant a new trial in the case in which Defendant was convicted of first degree murder based on the manner in which the trial court took the jury's verdict.

## II. Residual Hearsay Issue

In addition, the Court concludes that the trial court erred by refusing to admit the statement of Mr. Dalrymple, which Defendant sought to have admitted pursuant to N.C. Gen. Stat. § 8C-1, Rule

804(b)(5) after Mr. Dalrymple asserted his right not to incriminate himself guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 23 of the North Carolina Constitution when called as a witness by Defendant. Although I agree with the Court that the trial court's findings and conclusions concerning the admissibility of Mr. Dalrymple's statement contain a number of errors, I believe that the trial court's ultimate decision was correct.

The analytical framework that must be utilized in evaluating the admissibility of residual hearsay is well-established.

Once a trial court establishes that a declarant is unavailable pursuant to Rule 804(a) of the North Carolina Rules of Evidence, there is a six-part inquiry to determine the admissibility of the hearsay evidence proffered under Rule 804(b)(5). *State v. Fowler*, 353 N.C. 599, 608-[6]09, 548 S.E.2d 684, 696 (2001), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230 (2002); *State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986). . . . . Under either of the two residual exceptions to the hearsay rule, the trial court must determine the following: (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission. *State v. Smith*, 315 N.C. 76, 91-98, 337 S.E.2d 833, 844-[8]48 (1985); *accord* N.C. [Gen. Stat.] § 8C-1, Rule 804(b)(5) (2001); *see also Triplett*, 316 N.C. at 8-10, 340 S.E.2d at 740-741.

*State v. Valentine*, 357 N.C. 512, 517-18, 591 S.E.2d 846, 852 (2003). As a practical matter, however, the only one of the criteria enunciated in North Carolina's residual hearsay jurisprudence that is in serious dispute in this case is that relating to the "trustworthiness" of Mr. Dalrymple's statement.[4] For that reason, I will focus the remainder of my dissent on the trustworthiness issue.

---

4. In its brief, the State argues that Defendant failed to establish that Mr. Dalrymple's statement was more probative than any other evidence available to Defendant. According to the State, Defendant's own testimony would have been more probative than Mr. Dalrymple's statement. The State did not, however, cite any decision from any federal or state court indicating that the requirement that a criminal defendant's attempt to offer residual hearsay could be defeated because a criminal defendant refused to waive his federal and state right against compulsory self-incrimina-

"To be admissible under the residual exception to the hearsay rule, the hearsay statement must possess 'guarantees of trustworthiness' that are equivalent to the other exceptions contained in Rule 804(b)." *State v. McLaughlin*, 316 N.C. 175, 179, 340 S.E.2d 102, 104 (1986). In "determining . . . trustworthiness, the following considerations are at issue: (1) whether the declarant had personal knowledge of the underlying events, (2) whether the declarant is motivated to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) whether the declarant is available at trial for meaningful cross-examination." *Valentine*, 357 N.C. at 518, 591 S.E.2d at 852 (citing *State v. King*, 353 N.C. 457, 479, 546 S.E.2d 575, 592 (2001), *cert. denied*, 534 U.S. 1147, 151 L. Ed. 2d 1002 (2002); *State v. Tyler*, 346 N.C. 187, 195, 485 S.E.2d 599, 603, *cert. denied*, 522 U.S. 1001, 139 L. Ed. 2d 411 (1997); *State v. Nichols*, 321 N.C. 616, 624, 365 S.E.2d 561, 566 (1988). Although "[t]he trial court should make findings of fact and conclusions of law when determining if an out-of-court hearsay statement possesses the necessary circumstantial guarantee of trustworthiness to allow its admission," *State v. Swindler*, 339 N.C. 469, 474, 450 S.E.2d 907, 910-11 (1994) (citing *State v. Deanes*, 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), *cert. denied*, 490 U.S. 1101, 104 L. Ed. 2d 1009 (1989), and *Triplett*, 316 N.C. at 10, 340 S.E.2d at 742), this Court has held that, while "[t]he six part inquiry [set out in *Smith*] is very useful when an appellate court reviews the admission of hearsay under Rule 804(b)(5) or 803(24), . . . its utility is diminished when an appellate court reviews the exclusion of hearsay," since "[c]ommon sense dictates that if proffered evidence fails to meet the requirements of one of the inquiry steps, the trial judge's findings concerning the preceding steps are unnecessary." *Phillips & Jordan Investment Corp. v. Ashblue Co.*, 86 N.C. App. 186, 191, 357 S.E.2d 1, 3-4, *disc. review denied*, 320 N.C. 633, 360 S.E.2d 92 (1987); *see also State v. Hardison*, 143 N.C. App. 114, 118, 545 S.E.2d 233, 236 (2001); *State v. Harris*, 139 N.C. App. 153, 159, 532 S.E.2d 850, 854, *disc. review denied*, 353 N.C. 271, 546 S.E.2d 121 (2000). As a result, in cases in which the trial court made a trustworthiness determination without making findings of fact and conclusions of law, the Supreme Court has simply made its own evaluation of the record to determine whether the evidence supported the trial court's conclusion. *Valentine*, 357 N.C. at 518-19, 591 S.E.2d at 853 (citing *State v. Daughtry*, 340 N.C. 488, 514, 459 S.E.2d

---

tion, and I have not found any support for such a proposition in my own research. As a result, I agree with the Court's implicit decision to refrain from accepting the State's argument on this point.

747, 760 (1995), *cert. denied,* 516 U.S. 1079, 133 L. Ed. 2d 739 (1996) (upholding the trial court's generalized finding of trustworthiness based on a review of the record); *Swindler,* 339 N.C. at 474, 450 S.E.2d at 911 (reversing the trial court's generalized finding of trustworthiness based on a review of the record).

In analyzing the trial court's findings, the Court correctly concludes that the trial court erred to the extent that it believed that Mr. Dalrymple was acting against his own interests by refusing to testify at Defendant's trial. More particularly, as the State candidly concedes, to the extent that the trial court believed that Mr. Dalrymple subjected himself to a risk that the death penalty would be imposed upon him by declining to testify at Defendant's trial, that understanding of Mr. Dalrymple's agreement with the prosecutor's office is simply incorrect. Simply put, the agreement in question said nothing about what would happen if Mr. Dalrymple testified for a party other than the State. For that reason, Mr. Dalrymple's refusal to testify at Defendant's trial had no bearing on whether he subjected himself to a risk of execution for his role in Mr. Harrington's murder.

Furthermore, I agree with the Court's conclusion that the record contains no indication that Mr. Dalrymple ever recanted his statement to investigating officers and that the trial court erred to the extent that it equated Mr. Dalrymple's refusal to testify with a recantation. As the Court notes, Mr. Dalrymple was still subject to being prosecuted for first degree murder and "had no realistic choice except to invoke his Fifth Amendment rights since, if he testified, he would provide the State with admissions that could then be used to convict him at his own trial." For that reason, the Court correctly concludes that "the trial court erred in failing to hold that [Mr.] Dalrymple never recanted his September 2007 statement."

Finally, I agree with the Court that the fact that Mr. Dalrymple asserted his right against compulsory self-incrimination as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 23 of the North Carolina Constitution does not provide any basis for concluding that Mr. Dalrymple's statement is untrustworthy. An individual may invoke his or her constitutional protection against compulsory self-incrimination for a host of reasons that are unrelated to the trustworthiness of any statement that he or she may have given to investigating officers. As a result, to the extent that the trial court deemed the fact that Defendant invoked his federal and state constitutional right against compulsory self-incrimination to have any

bearing on the trustworthiness of his statement, any such conclusion was erroneous.

I am not, at this point, prepared to either agree with, or dissent from, the Court's discussion of the appropriateness of the trial court's decision to consider the consistency of the information contained in Mr. Dalrymple's statement with other available evidence in evaluating the trustworthiness of his statement. Although there are certainly decisions that suggest that such considerations should not be taken into account in the course of conducting the required trustworthiness analysis, *State v. Finney*, 358 N.C. 79, 84, 591 S.E.2d 863, 866 (2004); *Tyler*, 346 N.C. at 199-203, 485 S.E.2d at 605-07; *State v. Hurst*, 127 N.C. App. 54, 61, 487 S.E.2d 846, 852, *disc. review denied*, 347 N.C. 406, 494 S.E.2d 427 (1997), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998), these decisions predicate this requirement on the dictates of the Confrontation Clause of the Sixth Amendment of the United States Constitution as construed in *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638 (1990). In view of the fact that the approach to Confrontation Clause issues embodied in *Wright* has been super-seded by the approach embodied in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004); the fact that the evidence at issue here was proffered by Defendant rather than the State; and the fact that earlier decisions of the Supreme Court, such as *Nichols*, 321 N.C. at 625, 365 S.E.2d at 567, allowed for consideration of "corroborating evidence" during the required trustworthiness analysis, it is not en-tirely clear to me that the Court is correct in concluding that "the trial court erred in determining the trustworthiness of the September 2007 statement by comparing it to other evidence presented at trial." However, since the policy justifications that underlie many of the other hearsay exceptions set out in N.C. Gen. Stat. § 8C-1, Rule 804(b) focus primarily on the circumstances surrounding the making of the statement in question, *see, e.g.*, *State v. Stevens*, 295 N.C. 21, 29, 243 S.E.2d 771, 776 (1978) (stating that the hearsay exception for dying declarations rests "upon the tenet that when an individual believes death to be imminent, the ordinary motives for falsehood are absent and most powerful considerations impel him to speak the truth"); *Smith v. Moore*, 142 N.C. 277, 287, 55 S.E. 275, 278 (1906) (stating that admissions against interest are admissible because "[t]his natural dis-position to speak of favor of, rather than against interest, is so strong that when one has declared anything to his own prejudice, his state-ment is so stamped with the image and superscription of truth that it is accepted by the law as proof of the correctness and accuracy of what was said"), and since I do not believe that it is necessary to

resolve this question in order to decide the present issue, I will refrain from commenting on this issue at the present time.

At bottom, the Court concludes that, since each of the reasons that the trial court gave for excluding Mr. Dalrymple's statement was in error, the trial court erred by excluding his statement. I am not satisfied with this justification for overturning the trial court's ruling. Instead, I believe, on the basis of decisions such as *Valentine*, *Ashblue Co.*, *Hardison*, and *Harris*, that our task on appeal, given the situation that we face in this case, is to make our own determination of whether Mr. Dalrymple's statement is sufficiently trustworthy to be admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5). The Court does not, it seems to me, ever address this question.

When I undertake what I believe to be the necessary trustworthiness evaluation, it appears to me that the only factors that militate in favor of a finding of trustworthiness are that Mr. Dalrymple had personal knowledge of the events that occurred at the time of Mr. Harrington's death and that he never recanted his statement after giving it to investigating officers. Unlike Defendant, I am not persuaded that Mr. Dalrymple "was motivated to speak the truth by the State's agreement to take death off the table." On the contrary, the existence of such sentence concessions is typically a basis for challenging, rather than bolstering, a witness' credibility. *State v. Carey*, 285 N.C. 497, 508, 206 S.E.2d 213, 221 (1974) (holding that trial court erred by limiting the scope of cross-examination during a first degree murder trial "so as to exclude all mention of the death penalty" because the "question of [the witness'] credibility and bias is of such vast importance in this case" and because "one very important factor which may have influenced [the witness'] decision to cooperate with the State was the possibility that . . . he might have been convicted and sentenced to death"). In other words, it seems to me that the fact that Mr. Dalrymple was facing the possibility of a death sentence, instead of motivating him to tell the truth, might well have impelled him to say whatever he thought was necessary to further his own interests. *See Swindler*, 339 N.C. at 475, 450 S.E.2d at 911 (finding a lack of trustworthiness because, among other things, declarant's motivation "was not . . . to speak the truth, but rather for him to say what the police wanted to hear"); *McLaughlin*, 316 N.C. at 180, 340 S.E.2d at 105 (finding a lack of trustworthiness because, among other things, the declarant "made the statement to gain favor with the police and in hopes of a favorable plea bargain"). As a result, I am inclined to find that the circumstances under which Mr. Dalrymple made his state-

STATE v. SARGEANT

[206 N.C. App. 1 (2010)]

ment to investigating officers militates against, rather than for, its trustworthiness. *Id.*, 316 N.C. at 180, 340 S.E.2d at 105 (holding that the trial court erred by admitting the statement of an accomplice because "[t]he totality of the circumstances surrounding [the accomplice's] confession justifies our conclusion that it lacked the required 'equivalent . . . guarantees of trustworthiness' "). As a result, I believe that the only factors that tend to support a finding of trustworthiness are the fact that Mr. Dalrymple had the requisite personal knowledge and the fact that he never recanted his statement after making it. These factors are not, at least in my opinion, adequate to justify a conclusion that Mr. Dalrymple's statement was sufficiently trustworthy to permit its admission into evidence pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) when considered in conjunction with the questions about Mr. Dalrymple's motivations that arise from the sentencing concessions that he received from the State. Since the Court concludes otherwise, I respectfully dissent from its decision to grant Defendant a new trial in the case in which he was convicted of first degree murder on the basis of this issue as well.

### III.  Conclusion

For the reasons set forth above, I respectfully disagree with the Court's conclusion that the trial court violated Article I, section 24 of the North Carolina Constitution by taking the jury's verdicts with respect to the issue of Defendant's guilt of first degree murder on the basis of lying in wait and the felony murder rule separately from its verdict with respect to the issue of Defendant's guilt of first degree murder on the basis of premeditation and deliberation. In addition, I respectfully disagree with the Court's conclusion that the trial court erred by refusing to admit Mr. Dalrymple's statement into evidence pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5). As a result, I respectfully dissent from the Court's decision awarding Defendant a new trial in the case in which he was convicted of first degree murder.